**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

SYNGENTA SEEDS, INC., a Delaware
corporation,

        Plaintiff,

vs.

BUNGE NORTH AMERICA, INC., a
New York corporation,

        Defendant.

No. C 11-4074-MWB

**MEMORANDUM OPINION AND
ORDER REGARDING PLAINTIFF'S
MOTION FOR PRELIMINARY
INJUNCTION**

_____

**TABLE OF CONTENTS**

I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
   A. Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
      1. The parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
      2. The transgenic corn at issue . . . . . . . . . . . . . . . . . . . . 5
      3. The parties' dispute . . . . . . . . . . . . . . . . . . . . . . . . 6
         a. Domestic and foreign approval . . . . . . . . . . . . . . . . 6
         b. Bunge's Policy . . . . . . . . . . . . . . . . . . . . . . . . 7
         c. The "major importer" dispute . . . . . . . . . . . . . . . . 10
         d. Bunge's refusal to change its Policy . . . . . . . . . . . 12
      4. Positions of other elevator companies . . . . . . . . . . . . . . . 13
      5. Syngenta's evidence of irreparable harm . . . . . . . . . . . . . 14
   B. Procedural Background . . . . . . . . . . . . . . . . . . . . . . . . . . 16
      1. Syngenta's Complaint . . . . . . . . . . . . . . . . . . . . . . . 16
      2. Syngenta's Motion For A Preliminary Injunction . . . . . . . . 19
      3. Syngenta's Amended Complaint . . . . . . . . . . . . . . . . . . 20
      4. Additional briefing . . . . . . . . . . . . . . . . . . . . . . . . 21
      5. The evidentiary hearing . . . . . . . . . . . . . . . . . . . . . 21

II. LEGAL ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
   A. Standards For A Preliminary Injunction . . . . . . . . . . . . . . . . 22
   B. Likelihood Of Success On The Merits . . . . . . . . . . . . . . . . . 25

*1.*  *The USWA claim* . . . . . . . . . . . . . . . . . . . . . . . . . . .  26
  *a.*  *Arguments of the parties* . . . . . . . . . . . . . . . . . .  26
  *b.*  *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  31
      *i.*  *Purpose and provisions of the USWA* . . . . . . .  31
      *ii.*  *Courts to consider a private right of action under the USWA* . . . . . . . . . . . . . . . . . . . .  35
      *iii.*  *Congressional authorization of private rights of action* . . . . . . . . . . . . . . . . . . . . . . . . . . . .  38
      *iv.*  *Whether § 247 creates a private right of action* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  41
      *v.*  *Whether § 245(d) creates a private right of action for violation of § 247* . . . . . . . . . . . .  44
      *vi.*  *Standing* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  47
      *vii.*  *The merits* . . . . . . . . . . . . . . . . . . . . . . . . . . . .  49
  *2.*  *The other warehousing claims* . . . . . . . . . . . . . . . . . .  49
  *3.*  *Third-party beneficiary contract claim* . . . . . . . . . . . .  50
    *a.*  *Arguments of the parties* . . . . . . . . . . . . . . . . . .  50
    *b.*  *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  51
  *4.*  *The Lanham Act claim* . . . . . . . . . . . . . . . . . . . . . .  53
    *a.*  *Arguments of the parties* . . . . . . . . . . . . . . . . . .  53
    *b.*  *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  56
*C.*  *Irreparable Harm To Syngenta* . . . . . . . . . . . . . . . . . . .  59
  *1.*  *Arguments of the parties* . . . . . . . . . . . . . . . . . . . . .  59
  *2.*  *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  60
*D.*  *Balance Of Equities* . . . . . . . . . . . . . . . . . . . . . . . . . . .  62
  *1.*  *Arguments of the parties* . . . . . . . . . . . . . . . . . . . . .  62
  *2.*  *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  64
*E.*  *The Public Interest* . . . . . . . . . . . . . . . . . . . . . . . . . . .  67
  *1.*  *Arguments of the parties* . . . . . . . . . . . . . . . . . . . . .  67
  *2.*  *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  67

*III.*  *CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  68

C an a grain elevator company refuse to accept certain corn at its facilities, on the ground that the corn has not received approval from "major" export destinations, and post signs stating this, when the seed producer has received clearances from the United States and several foreign countries, but not from China or the European Union?  The seed producer argues that the grain elevator company cannot do so, at least not without violating the United States Warehouse Act (USWA), 7 U.S.C. § 241 *et seq.*, comparable provisions of state statutory and common law, and the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), and causing irreparable injury to the seed producer's business and reputation.  Thus, the seed producer seeks a preliminary injunction against the grain elevator company enjoining the grain elevator company's refusal to accept the transgenic corn, while the seed producer litigates its USWA, Lanham Act, and state common-law and statutory claims.  The grain elevator company counters that the seed producer has no likelihood of success on its claims, because there is no private right of action under the USWA; the seed producer has no standing to assert such a claim if a private right of action does exist; all of the grain elevator company's elevators are licensed pursuant to the USWA, which preempts state statutes and common law; and the grain elevator company is not a competitor of the seed producer, which defeats the seed producer's Lanham Act claim.  Moreover, the grain elevator company argues that it will be disproportionately harmed, if the court grants the preliminary injunctive relief requested.

3

## I.  INTRODUCTION

### A.  Factual Background

I am mindful of the general rule that "the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits." *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981); *accord United States Sec. and Exchange Comm'n v. Zahareas*, 272 F.3d 1102, 1105 (8th Cir. 2001) ("[W]e have long held that 'findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding.'") (quoting *Patterson v. Masem*, 774 F.2d 251, 254 (8th Cir. 1985)); *National Credit Union Admin. Bd. v. Johnson*, 133 F.3d 1097, 1103 n. 5 (8th Cir. 1998) (quoting this principle from *Camenisch* ); *Henderson v. Bodine Aluminum, Inc.*, 70 F.3d 958, 962 (8th Cir. 1995) (citing this statement from *Camenisch* as the "general rule" for findings of fact and conclusions of law in preliminary injunction rulings).  Thus, all findings of fact and conclusions of law in this ruling are provisional.

### 1.    The parties

Plaintiff Syngenta is a major agribusiness company, incorporated in Delaware, with its principal place of business in Minnetonka, Minnesota.  Among other things, Syngenta is involved in the commercial seed business, developing, producing, and selling, through dealers and distributors or directly to growers, a wide range of agricultural products, including corn and soybean seed with useful traits developed with modern biotechnology. Syngenta brands include Garst, Golden Harvest, and Northrup King; some of its seed is also labeled under the names of other smaller seed companies; and some of its seed or seed traits are also licensed to other seed companies, even competitors, such as Pioneer.

Defendant Bunge North America is a New York corporation with its principal place of business in St. Louis, Missouri.  Bunge operates approximately 71 grain and milling facilities and at least 66 grain warehouses (or elevators) in the central United States,

4

including two facilities in Iowa. Most of Bunge's facilities, like the two in Iowa, are located along the Mississippi River or its tributaries to facilitate barging of grain to Bunge's export facility near New Orleans, Louisiana. Syngenta asserted that most of Bunge's warehouses or elevators are licensed under the USWA, including Bunge's elevators and receiving stations in Meekers Landing and McGregor, Iowa, but Bunge asserts that *all* of its warehouses are licensed under the USWA.[1]

### 2. *The transgenic corn at issue*

After the investment of as much as twenty years of product research and development and hundreds of millions of dollars (not including advertising costs), Syngenta has developed a genetic trait called MIR162 (or VIP 3A), sold under the Agrisure® Viptera™ trademark. The superior characteristic of Viptera corn is that it controls insects, such as the "multi-pest complex," which Syngenta's evidence showed causes American corn growers more than $1.1 billion annually in lost yield and grain quality. The reduction in insect damage to corn as a result of the Viptera genetic trait also reduces the development of fungus and mycotoxins in stored corn. Bunge agrees that Viptera has insecticidal properties and, indeed, points out that Viptera corn is considered a federally-registered pesticide that is licensed under the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), which Syngenta does not dispute.

Prior to the 2011-2012 crop year, Viptera corn was only grown in test plots and seed fields. However, Syngenta commercially launched Viptera corn seed in the United States for the 2011-2012 growing season when it opened its sales for the 2011 planting

---

[1] Syngenta asserts that Bunge's facility at Meekers Landing, Iowa, does not appear to be licensed under the USWA, but that it is still subject to similar obligations under Iowa common law and IOWA CODE § 203C.27. Bunge demonstrated that this facility is licensed under the USWA.

season in August of 2010.  As part of its commercial launch of Viptera cron, Syngenta has offered farmers a "side-by-side program," which encourages farmers to plant Viptera corn seed side-by-side with other seed in order to see how the Viptera trait's protection affects yields.  Syngenta asserts that it has received excellent feedback from growers and resellers, to the effect that Viptera outperforms other corn on a variety of important measures.  For the 2010-2011 crop year, Syngenta delivered Viptera products to approximately 12,000 growers and projected a yield of 250 million bushels of Viptera corn.  Prior to the parties' dispute, Syngenta had projected that Viptera seed sales would exceed twenty percent of the United States corn seed market in future years.

### 3.     The parties' dispute

The impetus for the present litigation is Bunge's refusal to accept Viptera corn at any of its facilities starting in the summer of 2011.  Bunge asserts that its reasons for this decision involve the history of regulatory approval for Viptera in various import countries and, more specifically, the lack of such approval from China prior to the commercial release of Viptera.  Syngenta asserts that Bunge is unfairly refusing to take Viptera corn for which all required and recommended import approvals have been obtained.

### a.     Domestic and foreign approval

Before selling Viptera for grain production in the United States, Syngenta was obligated to and did get approval from the USDA, the EPA, and the FDA.  More specifically, the USDA and the EPA have determined that Viptera products containing MIR162 are safe for cultivation and use and that they present no risk to the environment, while the FDA found that Viptera-produced grain is safe for human consumption. In addition, consistent with the voluntary policy recommendations of the Biotechnology Industry Organization (BIO) and the National Corn Growers Association (NCGA), Syngenta sought and obtained import approvals for Viptera corn from Canada and Japan

6

prior to commercialization.  Syngenta actually exceeded these recommendations, by also obtaining import approval for the Viptera trait in Australia, Brazil, Mexico, New Zealand, the Philippines, Korea, Russia, and Taiwan, as well as cultivation approval in Canada, Argentina, and Brazil.  Syngenta has not yet obtained import approval for Viptera corn from China or the European Union (EU), but it anticipates receiving approval from China by March 2012.

In September 2010, at about the time that Syngenta launched the commercial sale of Viptera seed, the North American Export Grain Association (NAEGA) urged BIO to "define the minimum markets in which regulatory requirements should be met prior to commercialization to include the United States, Canada, Japan, Mexico, The Philippines, *China*, Taiwan, and Korea for biotechnology products in commodity corn, soybeans, and canola in the United States and Canada," and that the EU should be considered at least for soybeans and canola.  Plaintiff's Exhibit 31 (BNA 0002290) (emphasis added).  BIO did not change the recommended list of countries in which regulatory approval for corn should be obtained, however, and Syngenta adherred to BIO's existing recommendation concerning import approvals when it launched Viptera corn for commercial sale in the fall of 2010.

### b.    *Bunge's Policy*

In the spring of 2010, when Syngenta had not yet received import approval for Viptera corn from Japan and Korea, and Syngenta was not yet selling Viptera seed to farmers, Bunge posted the following policy regarding Viptera corn at its facilities:

> Please note that Bunge currently **is unable to accept** delivery
> of the following seed product for the 2010 growing season:
>
> **Agrisure Viptera**
> **MIR162 (Syngenta)**

> This seed has not received necessary approval from Japan or
> Korea, major export destinations for the U.S.
>
> All Bunge facilities are integrated into the export market,
> which is why the terms of Bunge's purchase contract states that
> Bunge will not accept grains or oilseeds containing transgenic
> events not approved for U.S. export markets.
>
> Bunge will accept a listed product once the seed is approved in
> Japan and Korea.
>
> Please contact the facility manager or your grain marketing
> specialist if you have any question.

Defendant's Exhibit F, April 16, 2010, Notice (BNA 0001538) (emphasis in the original).

Syngenta received import approval for Viptera corn from Japan in June 2010. Thereafter, on October 1, 2010, Bunge changed the sign above to remove any reference to a specific country and to add Plenish soybeans (a DuPont/Pioneer product) to the list of products that it would not accept. Defendant's Exhibit F, October 1, 2010, Notice (BNA 0001539). On October 25, 2010, Syngenta received import approval for Viptera corn from Korea, and the following day, Bunge again changed its posted policy to remove any and all references to Viptera. Defendant's Exhibit F, October 26, 2010, Notice (BNA 0001542). At that point, Bunge had no policy to reject Viptera corn. Indeed, Douglas A. McNeely, Bunge's regional manager for the grain division in the Center Gulf region, testified that, from October 25, 2010, until July 5, 2011, if a farmer had asked, Bunge would have told the farmer that it would accept Viptera grain in the 2011-2012 growing season. However, there is no evidence that any farmers actually made such an inquiry of Bunge at any time between October 2010 and July 2011.

*After* planting time for the 2011-2012 crop year, Bunge again changed its policy about Viptera corn, even though Bunge knew what export approvals Syngenta had received

for the Viptera trait.  In a series of internal e-mails in May and June 2011, Defendant's Exhibit I, Bunge officials considered making import approval by China a requirement for accepting corn.  The exchange of e-mails was actually initiated by Diana Felner, Bunge's director of government affairs, as a discussion of ways to try to encourage China to speed up its approval process, because of the concerns in the industry that technology providers were losing sales in the United States if the grain handling industry insisted on awaiting Chinese approval for corn.  *See* Defendant's Exhibit I (BNA 0001667).  As of June 9, 2011, the parties to the e-mails had reached what Felner identified as a "decision point" about whether to accept corn that was not approved in China.  The pressure for the decision was China's sudden increase of corn imports, making it the seventh largest United States corn import market for the 2009-2010 crop year according to NCGA, with projections that it would move into the top five in 2011-2012, and China's lack of approval for Syngenta's Viptera trait.  Defendant's Exhibit I (BNA 0001689).  There is also no dispute that, in the spring of 2011, Bunge had entered into several large contracts to export United States corn to China, for delivery between September 2011 and January 2012.  At that time, Bunge anticipated that commercial Viptera corn yields in 2011 would be less than half what Syngenta now claims.  Bunge decided not to accept Viptera corn in 2011.

Therefore, on July 5, 2011, Bunge posted a new policy (Policy) regarding acceptance of Viptera corn.  That Policy announced that Bunge would reject all Viptera-produced grain at all of Bunge's locations, as follows:

> Please note that Bunge currently is **unable to accept** delivery of corn/soybeans produced from the following seed products for the 2011/2012 growing season:
>
> **Agrisure® Viptera™ - MIR162 (Syngenta)**
> **Plenish™ soybeans (DuPont/Pioneer)**

> These seed products have not received necessary international approval from major export destinations for the U.S.
>
> All Bunge facilities are integrated into the export market, which is why the terms of Bunge's purchase contract states that Bunge will not accept grains and oil seeds containing transgenic events not approved for U.S. export markets.
>
> Bunge will accept a listed product once the seeds receive approval from major export markets.

Plaintiff's Exhibit 14 (emphasis in original).  As of the beginning of August 2011, 69 Bunge locations had posted the Policy on their website and at least 19 Bunge facilities in 7 states had posted signs stating the Policy.

### c.    The "major importer" dispute

Syngenta understood that Bunge's Policy rejecting Viptera corn was based on the fact that the Viptera trait has not yet received approval for import in China.  The parties dispute whether China is properly classified as a "major importer" for United States corn.

Neither the USDA, BIO, nor NCGA had identified China as a "major market" for United States corn exports prior to 2010, because China is the second largest corn producer in the world (after the United States) and historically has had higher corn stocks or inventories than the United States at the end of a growing season.  Also, exports to China have historically represented only about one-half of one percent of United States corn production and less than 3% of all United States corn exports.  On the other hand, China's United States corn purchases have recently increased dramatically and the industry as a whole, including the USDA, now generally considers China to be a significant market for United States corn that is and will be a major player in the corn market for years to come.  The undisputed evidence at the preliminary injunction hearing was that China had suddenly emerged as the seventh largest importer of United States corn in the 2009-2010

year, and Bunge's expert opined that China's imports of United States corn were likely to continue to increase. There is also undisputed evidence that Bunge had sold millions of dollars worth of corn to China in the spring of 2011 for delivery between September 2011 and January 2012. There was no dispute at the preliminary injunction hearing that China has a "zero tolerance" policy pursuant to which it will reject corn deliveries that contain *any* percentage of corn with unapproved genetic traits. In contrast, evidence was presented that it is relatively common within the non-genetically modified corn markets to see a purity level of 98.5 percent, so 1.5 percent of genetically modified product would be tolerated in that system, and that the EU will accept low levels of unapproved biotechnology traits.

Syngenta argued that Bunge could feasibly and reasonably designate specific bins, silos, or flat storage at each location for Viptera corn, arrange for coordinated delivery of Viptera corn for immediate transportation to non-export users, such as ethanol plants, food processors, or feed mills, or even designate a handful of elevators that would not accept Viptera-produced grain, then use that grain for exports to China. On the other hand, the undisputed evidence, from Mr. McNeely, is that all of Bunge's facilities are "integrated" into serving its export market, as all of its facilities either directly load corn onto barges to be taken to Bunge's export facility near New Orleans, Louisiana, or truck or send corn by rail to such barge-loading facilities. Mr. McNeely testified, without contradiction, that fifty to sixty percent of corn received by Bunge facilities is ultimately exported; that corn not being exported is consumed at grind facilities, and some by-products are then exported; and that some corn is used domestically for poultry feed, wet milling, and other purposes; but that Bunge cannot designate corn as export or non-export when Bunge receives it. Moreover, Mr. McNeely testified, again without contradiction, that to develop a separate receiving system to "identity preserve" Viptera corn separate from other commingled

commodity corn, from the dump pit to the barge, would cost $6 million to $8 million *per facility*. Based on this evidence, it is not commercially reasonable or feasible for Bunge to make such modifications to its facilities.

Bunge's contracts with growers require growers to agree not to deliver corn containing unapproved events in export markets, and Bunge reminds growers of that commitment with appropriate signs at delivery locations. While Syngenta asserts that Bunge is not even testing incoming corn deliveries for the Viptera trait, Syngenta did not rebut Bunge's evidence, from Mr. McNeely, that Bunge is not aware of any test for the Viptera trait that would meet China's "zero tolerance" for unapproved genetic traits. As a practical matter, testing each load of corn presented to a Bunge facility would further slow the "truck line" of producers delivering grain, which Bunge had determined would displease producers. The unrebutted evidence at the hearing also indicated that, if a shipment of corn to China was rejected for contamination with an unapproved transgenic trait, such as Viptera, the redirection costs could be anywhere from $4 million to $20 million for that shipment.

### d.    Bunge's refusal to change its Policy

Bunge notified Syngenta of its new Policy on July 6, 2011. Bunge also told Syngenta that Bunge understood that other receivers, including CGB and LouisDreyfus, were also rejecting Viptera, that it understood that Cargill and ADM were not accepting Viptera at their wet mills, and that it understood that some ethanol facilities also would not accept Viptera, because an exportable byproduct (distiller's dry grain with solubles, or DDGS) could not be exported if it contained Viptera.

On August 11, 2011, Chuck Lee, who describes himself as the head of corn for Syngenta in North America, met with Douglas McNeeley, Bailey Ragan, and Diana Felner of Bunge in St. Louis, Missouri, to ask if Bunge was willing to take down the signs

reflecting its Policy, or to inform growers that Bunge would be willing to work with growers who planted Viptera corn, but Bunge refused both requests.[2]   Although Bunge's representatives purportedly told Lee that they believed that "all the grain industry" was committed to rejecting Viptera-produced grain, Lee believed that they appeared alarmed when he told them that other grain elevators were accepting Viptera-produced grain.

### 4.    *Positions of other elevator companies*

Syngenta presented evidence that Cargill, CHS, and other grain elevators in the same areas as Bunge's elevators are taking Viptera-produced grain or have stated that they will work with farmers so that the warehouses can accept Viptera-produced grain at harvest or direct farmers to facilities that will accept Viptera corn.[3]   It is now undisputed that neither Cargill nor ADM will accept Viptera corn at any of their North American wet milling plants until Viptera corn receives regulatory approval from the EU.  In September, Cargill posted the following sign:

---

[2]At the evidentiary hearing on Syngenta's Motion For Preliminary Injunction, I encouraged the parties to negotiate acceptable language for the sign.  Indeed, I told the parties that I thought their dispute about the language of the sign was silly, gave them reasons why, offered some suggestions, and urged them to consider reaching an agreement, because if Syngenta ultimately prevailed on its Lanham Act claim, such efforts now would reduced Syngenta's damages.  Both parties indicated some willingness to work out mutually acceptable language for a sign, regardless of how I ultimately ruled on Syngenta's Motion For Preliminary Injunction.  I hope that they did so, as it would be in both parties' best interest, regardless of how I rule on the Motion For Preliminary Injunction or how the merits are ultimately resolved.

[3]Syngenta indicated that it had found two or more elevators accepting Viptera corn within 60 miles of nearly every Bunge elevator, and elevators accepting Viptera corn within 200 miles of the one Bunge elevator for which there was no alternative within a 60-mile radius.  *See* Plaintiff's Exhibit 49 at 58-69 (Declaration of Mark Sather, Exhibit 1).

> Corn hybrids containing Syngenta's Viptera™ trait (MIR 162) are not approved in all major US export markets.
>
> You must notify us in writing prior to delivery of any Viptera™ corn, as we may not be able to accept this product.

Defendant's Exhibit AE. Syngenta points out that ADM and Cargill, unlike Bunge, are working with growers who have grown Viptera corn to accommodate those growers with alternate delivery options. Unlike Bunge, however, Cargill operates feed lots, and has other domestic outlets for corn, so that it can efficiently redirect Viptera corn to domestic consumption only. The bid sheet for LouisDreyfus Commodities from August 19, 2011, indicates that "[t]he following corn events are not approved for all YC [yellow corn] and DDG [distiller's dry grain] markets and will not be accepted for our purchase contracts: . . . MIR162 [Viptera]." Defendant's Exhibit V.

### 5.   *Syngenta's evidence of irreparable harm*

Syngenta presented evidence that its reputation and goodwill with the growers who use its products will be threatened if Bunge persists in its refusal to accept Viptera-produced grain. Although the 12,000 growers of Viptera corn in 2011 are centered in Nebraska, Iowa, Illinois, and Missouri, at least some Viptera corn growers can be found in nearly every state, so the market for Viptera products is very broad across the United States. *See* Plaintiff's Exhibit 33 (2011 Agrisure Viptera Grower Locations). Nevertheless, neither party presented or professed to be aware of any instance in which a farmer was specifically turned away from a Bunge facility when the farmer attempted to deliver Viptera corn.

Nor was there any direct evidence that any Viptera farmers are confused or misled by Bunge's posted Policy, although Syngenta asserts that farmers' anger at Syngenta suggests that farmers have been misled into believing that Syngenta did something wrong

in marketing Viptera before obtaining all import approvals.  More specifically, Syngenta presented anecdotal evidence that Bunge's rejection of Viptera corn has resulted in instances in which individual farmers, seed dealers, and local cooperatives have blamed Syngenta, not Bunge, for Bunge's refusal to take their Viptera corn.  One cooperative in Nebraska canceled an order with Syngenta for $1.5 to $2 million in crop protection products (such as herbicides and fungicides) because of its displeasure over the inability of its farmer/members to deliver Viptera corn to various elevators.  *See* Plaintiff's Exhibit 44.  I also find that, since Bunge posted its Policy, Syngenta's representatives have spent considerable time responding to questions from farmers and seed dealers concerning acceptance of Viptera corn at area elevators and have spent considerable time attempting to help farmers locate facilities that would accept Viptera corn.  Syngenta presented unrebutted evidence that its call centers are open six days a week and that they now get between about 5 and 50 calls and about a half dozen e-mails per day from growers that are having difficulty locating outlets for Viptera corn.  Some independent seed resellers, as well as farmers, are also angry and are questioning their purchases of Syngenta seeds and their ongoing relationships with Syngenta, in light of Bunge's Policy of rejecting Viptera corn, and those resellers believe that their own reputations have been injured.  *See* Plaintiff's Exhibit 43 (Letter from seed dealer).

I have little doubt that, in the highly competitive corn seed business, Bunge's refusal to accept Viptera-produced grain will cause many farmers to question their decision to buy Viptera seed this year, and may cause them not to buy Syngenta products in future years. Syngenta asserts that the amount of lost sales arising from Bunge's conduct is difficult to calculate, not least because of the other influences, such as weather, prices, and other factors, on a farmer's decision about what seed to plant.

Bunge counters that any anger that farmers may feel about being misled about the acceptability of Viptera corn for export markets properly lies with Syngenta, because Syngenta marketed Viptera seed before obtaining regulatory approval from China or the EU. Bunge admitted that it has canceled approximately five growers' contracts, because they had grown Viptera corn. Bunge presented evidence that it has at times assisted farmers with determining where they could deliver Viptera corn, but that it has no program to do so. Syngenta does not deny that it refused Bunge's suggestion that Syngenta assist farmers with redirection costs, if they could not deliver Viptera corn to a Bunge facility.

I also find that, although Syngenta and Bunge were both in a position to recognize that sales of Viptera corn would not be possible to exporters of corn to China *before* the 2011 planting season, neither made any effort to inform growers of that specific fact at that time. At best, Bunge's grower contracts informed growers, more generally, "Seller shall not deliver, and Buyer has the right to reject delivery of, Goods containing transgenic genes/traits that are not approved for sale in Japan, Mexico, The European Union and other U.S. export markets." Defendant's Exhibit A, Bunge Purchase Contract, General Terms and Conditions, ¶ 2. Similarly, Syngenta's Stewardship Agreement provides, under Grower Responsibilities, *inter alia*, that "Grower agrees to . . . [c]hannel grain produced from Seed to appropriate markets as necessary to prevent movement to markets where the grain has not yet received regulatory approval for import." Defendant's Exhibit AJ (Syngenta Seeds, Inc. Stewardship Agreement) (SYT00001338).

## B.  Procedural Background

### 1.    Syngenta's Complaint

Syngenta filed its Complaint (docket no. 1) against Bunge in this matter on August 22, 2011, asserting various claims arising from Bunge's refusal to accept Viptera corn.

Syngenta asserts subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1332 (diversity), 28 U.S.C. § 1367 (supplemental jurisdiction for state-law claims), and 15 U.S.C. § 1121 (Lanham Act).  Syngenta asserts that venue is proper here, pursuant to 28 U.S.C. § 1391(b), in that Bunge is a corporation subject to personal jurisdiction in Iowa and a substantial part of the events giving rise to the claims occurred in Iowa.[4]

As to its claims, in **Count I**, Syngenta alleges a violation of the Lanham Act, 15 U.S.C. § 1125(a), on the ground that Bunge's conduct constituted false advertising and/or promotion.  Somewhat more specifically, this Count alleges that Bunge's stated Policy, website, signs, and radio advertisements misrepresent the regulatory and export approvals that Agrisure Viptera products have in the major export markets for corn, Bunge's ability to handle such products, and the destinations for grower-delivered corn at the majority of Bunge's facilities.  In **Count II**, Syngenta alleges a violation of the USWA, 7 U.S.C. § 241 *et seq.*, and 7 C.F.R. § 735.9(a), based, *inter alia*, on its contention that Bunge has unfairly and unreasonably refused to accept Viptera corn at all Bunge facilities, notwithstanding that Viptera corn is of the kind, type, and quality customarily stored or handled in the area of grain elevators such as Bunge's and that such corn is, absent other facts, in suitable condition for warehousing, and notwithstanding that Bunge has, at least as recently as last year, accepted corn at its facilities produced from other seed corn containing traits not approved in China.  In **Count III**, Syngenta alleges violation of the

---

[4]I doubt that this action belongs in the Western Division of the Northern District of Iowa, when Bunge has only two facilities in Iowa, both at the other end of the state, one in the Eastern Division of the Northern District of Iowa, and one in the Southern District of Iowa.  However, I raised that venue issue *sua sponte* in the course of the preliminary injunction hearing, so I will not address it until and unless the issue of proper venue is challenged and briefed, for example, in a motion to dismiss.

common-law requirements to accept grain as a public utility or, alternatively, violation of IOWA CODE § 203C.27.  This claim asserts, again, that Bunge's categorical refusal to receive Viptera-produced corn, even though dry and otherwise suitable for warehousing and storage, violates Iowa common-law and statutory duties.  In **Count IV**, Syngenta seeks declaratory judgment for federal and state warehousing violations declaring that Bunge is in violation of § 247 of the USWA, applicable state statutes, and the common law, and/or that its actions consistent with its Policy would be a violation of the USWA, applicable state statutes, and the common law.  In **Count V**, Syngenta asserts a claim for intentional interference with contractual relationships, asserting that Bunge's dissemination and enforcement of its Policy improperly interferes with Syngenta's contracts with farmers for the purchase and use of Viptera corn seed, in that Bunge's Policy and allegedly false statements are causing existing Syngenta customers to discontinue their contractual relationships with Syngenta with regard to Viptera corn seed.  In **Count VI**, Syngenta asserts a claim of interference with prospective business advantage, on the ground that Bunge's Policy and allegedly false statements have induced and will induce farmers not to enter into or to continue their relationships with Syngenta.  In **Count VII**, Syngenta asserts a claim for business defamation, libel *per se*, or slander *per se*, again based on Bunge's allegedly false statements.  Finally, in **Count VIII**, Syngenta asserts a claim of violation of Minn. Stat. § 325D.44, concerning deceptive trade practices, and other states' codifications of the Uniform Deceptive Trade Practices Act, also based on allegedly false statements by Bunge.

As relief on its claims, Syngenta seeks judgment in its favor; preliminary and permanent injunctive relief, restraining Bunge, its officers, agents, subsidiaries, servants, partners, employees, attorneys, and all others in active concert with them, from posting, publishing, or disseminating the Policy, or acting consistently with the position expressed

18

in the Policy; awarding Syngenta damages, attorneys' fees, costs, expenses, and interest incurred in this action; and such other relief as the court may deem just and proper.[5]

### 2.    *Syngenta's Motion For A Preliminary Injunction*

On August 26, 2011, a few days after filing its Complaint, Syngenta filed the Motion For Preliminary Injunction (docket no. 5) now before me, seeking expedited relief, premised primarily on Syngenta's asserted likelihood of success on the merits of its USWA claim, Iowa common-law and statutory warehousing claims, and Lanham Act claim, and asserting that Bunge's actions are causing immediate and irreparable harm to Syngenta, in loss of reputation and goodwill with farmers and Syngenta's product resellers.  As relief, Syngenta seeks a preliminary injunction enjoining Bunge from posting and disseminating its Policy of rejecting Agrisure Viptera corn at all Bunge locations, from implementing or enforcing its Policy, from refusing to accept Agrisure Viptera corn based upon the existence of the MIR162 trait in such grain, and from disseminating false or misleading statements regarding Agrisure Viptera corn or the approval status of Agrisure Viptera corn.

On August 29, 2011, after consulting with the parties, I set Syngenta's Motion For Preliminary Injunction for hearing on Monday, September 19, 2011.  *See* Order (docket no. 7).  I also directed that the parties' briefs be filed on or before 5:00 p.m. on September 16, 2011.  At the conclusion of a conference on discovery issues on September 6, 2011, with the parties' agreement, I revised the briefing schedule to require Bunge to file its

---

[5]By Order (docket no. 26), filed September 12, 2011, Chief United States Magistrate Judge Paul A. Zoss granted Bunge's motion to extend its time to file an Answer to Syngenta's Complaint to September 23, 2011.  As of September 26, 2011, no Answer had been filed.  On September 14, 2011, Judge Zoss also entered an Order (docket no. 28) on the parties' Joint Motion For Approval Of Stipulated Interim Protective Order.

resistance brief on or before September 14, 2011, and to allow both parties to file supplemental briefs on or before September 16, 2011. *See* Hearing Minutes (docket no. 19). On September 15, 2011, Bunge filed its Response In Opposition To Syngenta Seeds, Inc.'s [sic] Motion For A Preliminary Injunction (docket no. 32).[6] On the evening of September 16, 2011, Syngenta e-mailed to opposing counsel, the electronic case filing e-mail address for sealed documents, and me its Reply Brief In Support Of Motion For Preliminary Injunction with a Supplemental Appendix, which was ultimately filed as docket no. 40. Shortly before midnight on September 16, 2011, Bunge filed a Supplemental Brief (docket no. 35), responding to Syngenta's Reply.

On September 16, 2011, I received an e-mailed courtesy copy of Syngenta's Reply Brief while I was en route from Tucson, Arizona, where I had been serving as a visiting judge, to Sioux City. I responded with an e-mail to counsel for both parties suggesting that they advise me by e-mail of any authority finding or rejecting a private right of action based on language similar or nearly identical to the language of the specific provisions of the USWA on which they were relying, as they had so far cited no such authority.

### 3.    *Syngenta's Amended Complaint*

In the wee hours of the morning, on September 18, 2011, that is, the Sunday before the scheduled preliminary injunction hearing, Syngenta filed its First Amended Complaint (docket no. 36). The First Amended Complaint adds a new claim, and adds a second exhibit, but is otherwise essentially identical to the original Complaint. The new claim, in **Count IX**, is a claim of breach of contract as a third-party beneficiary of Bunge's Licensing Agreement for Grain and Rice Warehouse Operators with the USDA Farm

---

[6]The filing of this Opposition was delayed one day by Bunge's timely request to file an overlength brief.

20

Service Agency (FSA).  The new exhibit is the Licensing Agreement for Grain and Rice Warehouse Operators itself.

### 4.    *Additional briefing*

Also on Sunday, September 18, 2011, Syngenta filed a Supplemental Brief In Support Of Motion For Preliminary Injunction (docket no. 37) asserting entirely new arguments that 7 U.S.C. § 245(d) authorizes a private right of action under the USWA with respect to any violation of any section of that Act, including 7 U.S.C. § 247(a), and that Syngenta is likely to succeed on the merits of its new third-party beneficiary breach-of-contract claim.  Shortly after midnight on Monday, September 19, 2011, Bunge filed a Response In Opposition To Syngenta Seeds, Inc.'s [sic] Supplemental Brief And Response To This Court's Request For Additional Authority (docket no. 38), challenging Syngenta's likelihood of success on its new claim and disputing Syngenta's new argument for a private right of action under the USWA.

### 5.    *The evidentiary hearing*

At the evidentiary hearing on September 19, 2011, Syngenta was represented by David A. Tank of Dorsey & Witney, L.L.P., in Des Moines, Iowa, and Daniel J. Brown, and Theresa M. Bevilacqua of Dorsey & Witney, L.L.P., in Minneapolis, Minnesota. Bunge was represented by Christopher M. Hohn, John Reynolds Musgrave, and Matthew A. Braunel of Thompson Coburn, L.L.P., in St. Louis, Missouri, with local counsel John C. Gray of the Heidman Law Firm in Sioux City, Iowa.

Syngenta presented the "live" testimony of Chuck Lee and the parties agreed that Syngenta's cross-examination of Douglas McNeely, when called as a witness for Bunge, would constitute and include Syngenta's direct examination of that witness.  In addition to Mr. McNeely's testimony, Bunge presented the "live" testimony of Dr. Merrill Joseph Bateman, its expert witness on the status of China as a "major importer" of United States

corn. The parties also submitted designated deposition testimony as part of the record for the evidentiary hearing. Syngenta offered twelve exhibits, all of which were admitted or admitted subject to Bunge's objections. Bunge offered eleven exhibits, all of which were received in their entirety. Portions of the testimony, particularly portions of Mr. McNeely's testimony, and certain exhibits, concerning specifics of Bunge's corn contracts with China, were sealed.

This matter is now fully submitted.

I was impressed with the scope and quality of the briefing of the complex issues presented in the short time available between the filing of Syngenta's Motion For Preliminary Injunction and the evidentiary hearing and the parties' ability to marshal a wealth of documentary evidence and testimony (live and by deposition) for presentation at the evidentiary hearing. It is a credit to counsel on both sides that much was accomplished in a very short time.

## II. LEGAL ANALYSIS

### A. Standards For A Preliminary Injunction

The Supreme Court recently reiterated that "[a] preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008) (citing *Munaf v. Geren*, 553 U.S. 674, 689-690 (2008)). As the Court explained,

> In each case, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Production Co.[v. Gambell]*, 480 U.S. [531,] 542, 107 S. Ct. 1396 [(1987)]. "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."

> *[Weinberger v.] Romero–Barcelo*, 456 U.S. [305,] at 312, 102
> S. Ct. 1798 [(1982)]; *see also Railroad Comm'n of Tex. v.
> Pullman Co.*, 312 U.S. 496, 500, 61 S. Ct. 643, 85 L.Ed. 971
> (1941).

*Winter*, 555 U.S. at 24.

As the Eighth Circuit Court of Appeals has explained,

> When evaluating whether to issue a preliminary
> injunction, a district court should consider four factors:
> (1) the threat of irreparable harm to the movant; (2) the state
> of the balance between this harm and the injury that granting
> the injunction will inflict on other parties; (3) the probability
> that the movant will succeed on the merits; and (4) the public
> interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d
> 109, 114 (8th Cir. 1981) (en banc). A preliminary injunction
> is an extraordinary remedy and the burden of establishing the
> propriety of an injunction is on the movant. *See Watkins, Inc.
> v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003). We review the
> denial of a preliminary injunction for abuse of discretion. *Id.*
> An abuse of discretion may occur when the district court rests
> its decision on clearly erroneous factual findings or erroneous
> legal conclusions. *TCF Nat'l Bank v. Bernanke*, 643 F.3d
> 1158, 1162–63 (8th Cir. 2011).

*Roudachevski v. All-American Care Centers, Inc.*, 648 F.3d 701, 705-06 (8th Cir. 2011).
The "*Dataphase* factors," quoted just above and generally relied upon in the Eighth
Circuit, are consistent with the factors relevant to success on a motion for preliminary
injunction as more recently articulated by the Supreme Court in *Winter*. *See Sierra Club
v. United States Army Corps of Engineers*, 645 F.3d 978, 989 (8th Cir. 2011). More
specifically, as the Supreme Court explained in *Winter*, "A plaintiff seeking a preliminary
injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely
to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of
equities tips in his favor, and [4] that an injunction is in the public interest." *Winter*, 555

23

U.S. at 20.  The relevant factors must be balanced:  Specifically, the Court clarified in *Winter* that, where the defendant's interests and the public interest outweighed the movant's interests, as demonstrated by the movant's showing of irreparable harm, it was unnecessary to consider whether the plaintiff had established a sufficient likelihood of success on the merits.  *See id.* at 23-24; *Sierra Club*, 645 F.3d at 992-93.

Bunge contends that where, as here, the plaintiff seeks *more* than simply maintenance of the *status quo*, and instead seeks a "mandatory injunction" requiring some positive act by the defendant, courts should be extremely cautious and should impose a heightened standard for granting a preliminary injunction, involving a clear showing of entitlement to relief or that extreme or serious damage will result in the absence of the injunction, such that withholding preliminary injunctive relief could make a final determination on the merits futile.  Syngenta counters that it is, indeed, attempting to reassert the *status quo* prior to Bunge's change of policy to reject Viptera corn in July 2011, after Syngenta had received import approval from Japan and Korea, which Bunge had indicated in the fall of 2010 was the only impediment to Bunge's acceptance of Viptera corn.  Thus, in Syngenta's view, it is not seeking a "mandatory" injunction, and no heightened standard is applicable.

The Eighth Circuit Court of Appeals has recognized that "'[t]he primary function of a preliminary injunction is to preserve the status quo until, upon final hearing, a court may grant full effective relief.'"  *Sanborn Mfg. Co. v. Campbell Hausfeld/Scott Fetzer Co.*, 997 F.2d 484, 490 (8th Cir. 1993) (quoting *Rathmann Group v. Tanenbaum*, 889 F.2d 787, 789-90 (8th Cir. 1989, in turn quoting *Ferry-Morse Seed Co. v. Food Corn, Inc.*, 729 F.2d 589, 593 (8th Cir. 1984)).  Thus, the court observed that "[r]equiring [the defendant] to take affirmative action . . . before the issue has been decided on the merits goes beyond the purpose of a *preliminary* injunction."  *Id.* (emphasis in the original).  The

court explained that, where a movant seeks on its motion for preliminary injunction substantially the same relief it would obtain after a trial on the merits, the movant's burden is particularly "heavy." *Id.* (citing *Dakota Indus., Inc. v. Ever Best Ltd.*, 944 F.2d 438, 440 (8th Cir. 1991)).  I conclude that, even if Syngenta is only attempting to reestablish through a preliminary injunction the *status quo* prior to Bunge's change in its Policy in July 2011, my disposition of Syngenta's Motion For Preliminary Injunction would be the same.  Thus, I need not decide if a heightened standard is required here.

I will consider each of the pertinent *Dataphase/Winter* factors in turn, beginning with "likelihood of success on the merits," the factor on which Bunge focuses its attention.

## B.  Likelihood Of Success On The Merits

"Success on the merits has been referred to as the most important of the four factors."  *Roudachevski*, 648 F.3d at 706.  In *Winter*, the Court noted that, as to the "likelihood of success" factor, "the standard for preliminary injunctive relief requires a showing of a 'likelihood of success on the merits rather than actual success' as necessary for permanent relief."  *Sierra Club*, 645 F.3d at 993 (quoting *Winter*, 555 U.S. at 32, in turn quoting *Amoco Prod. Co.*, 480 U.S. at 546 n.12).  The Eighth Circuit Court of Appeals has noted that this "preferred wording" of the standard for success differs somewhat from the "once familiar" formulation in *Dataphase* requiring the plaintiff to show that, "at the very least," the plaintiff had "established a fair ground for litigation." *Id.* at 993.  The question is not, however, whether the district court uses the preferred wording, but whether, in light of the evidence, the district court correctly concludes that the plaintiff is likely to succeed on at least some of its claims.  *Id.* at 993-94.

Syngenta argues that it has sufficient likelihood of success on the merits of its USWA, Iowa common-law and statutory, Lanham Act, and third-party beneficiary contract

claims to sustain the requested preliminary injunctive relief.  Bunge disagrees.  I will consider Syngenta's likelihood of success on each of the identified claims in turn.

### 1.    The USWA claim

#### a.    Arguments of the parties

Syngenta initially gave short shrift to the question of whether or not the USWA authorizes a private right of action, arguing only that a regulation, 7 C.F.R. § 735.9(a), provides for a private right of action for violations of the USWA, including violations of 7 U.S.C. § 247(a).  Syngenta focused, instead, on its argument that Bunge is violating the USWA, because Viptera-produced grain is no different from any other corn grown by United States farmers, in that it is of the kind, type, and quality customarily stored or handled in Iowa and all other areas containing Bunge elevators and that, absent other facts, it is in a suitable condition for warehousing—indeed, Syngenta contends that it is *more* suitable, because Viptera corn's demonstrated insect control makes corn less susceptible to insect damage, which otherwise can increase molds and mycotoxins.  Syngenta also argues that other elevators are accepting Viptera corn.  Consequently, Syngenta argues that Bunge is treating growers in an unfair and unreasonable manner, and harming Syngenta in the process, by refusing Viptera corn.  Syngenta argues that Bunge's reliance on the lack of import approval from China is unreasonable, because China actually has only a very small share of projected United States corn exports, and Bunge's Policy imposes unreasonable additional expenses on growers seeking a reasonably local elevator to which to deliver grain.  Syngenta also argues that Bunge has the facilities to keep Viptera corn separate from other corn, to coordinate delivery of Viptera corn with shipments to domestic buyers, or to designate only a handful of elevators as Viptera-free to service export contracts to China.  Syngenta also argues that Bunge's Policy of refusing to accept Viptera corn is unfair and unreasonable, because it is not likely to achieve the desired

26

result of Viptera-free corn stores, where there is a reasonable possibility of accidental delivery of Viptera corn, and Bunge does not even test corn at delivery or in storage for the Viptera trait.

Bunge counters with a much more extensive argument that the USWA does not create a private right of action for violations of 7 U.S.C. § 247(a). Bunge argues that the statute itself provides no private right of action, either expressly or impliedly, and, where the statute does not, a regulation cannot create such a right of action. Bunge points to the lack of any "rights-creating language" in the statute, which Bunge characterizes as concentrating on the conduct of the regulated warehouses, not on the "rights" of any class of persons. Even if the statute could be construed to create a private right of action, Bunge argues that Syngenta would not be in the class of persons to whom Congress intended to grant such rights, because Bunge asserts that there is no language in the USWA supporting the notion that Congress intended to confer rights on a biotechnology company that sold its product to farmers who deliver grain to regulated warehouses. Bunge also argues that the USWA already has an enforcement mechanism, granting the Secretary of Agriculture the exclusive powers of enforcement relevant here. Bunge points out that, where the USWA does create an express right of third-party actions, it is for breach of bonds in 7 U.S.C. § 245. In short, Bunge argues, the USWA is "regulatory" in character, leaving enforcement to the government. Bunge argues that USDA regulations, such as 7 C.F.R. § 735.9, identify only *where* a party could initiate an action, not *who is authorized to bring one*. Thus, Bunge argues that this regulation relates only to the limited right of private actions under 7 U.S.C. § 245, not actions for violation of 7 U.S.C. § 247. Bunge also argues that the regulation cannot create a private right of action not authorized by the statute. Thus, Bunge argues, Syngenta has no likelihood of success on its USWA claim,

where no cause of action exists, and, as a consequence, Syngenta does not have standing to pursue its claim in **Count II**.

Even if there is a private right of action under the USWA, Bunge argues that Syngenta cannot satisfy the elements of § 247 claim.  This is so, Bunge argues, because there is no custom or practice of accepting Viptera corn for a product first made available to farmers in the 2011-2012 crop year, and no ordinary and usual course of business to accept such grain.  Bunge then argues that it cannot be argued that Viptera is no different from any other corn grown by United States farmers, where it has unique insecticidal properties, and its creation, development, and release were governed by extensive regulations.  Bunge also asserts that other grain handlers have rejected Viptera corn.  Bunge argues that its conduct was fair, reasonable, and non-discriminatory, because Bunge sells corn to an international market, including China, which has not approved Viptera for import.  Finally, Bunge asserts that, because its facilities are "integrated" into or "interconnected" with the export market, a ban on accepting Viptera corn at any of its facilities is the best way to avoid unintentional shipment of Viptera corn to China.

In reply, Syngenta asserts that the case on which Bunge relies as rejecting a private cause of action under the USWA turned on former § 270, which authorized "penal action" by the Secretary, but that provision was eliminated in 2000.  Syngenta points out that, at the same time that provision was eliminated, Congress added the federal jurisdiction provision in § 255, which Syngenta argues clearly contemplates federal district court actions "brought under this chapter," while 7 C.F.R. § 735.9 contemplates such actions by "a person," not just the Secretary.  Syngenta also asserts that cases interpreting statutes with a series of remedial steps by an enforcing agency are distinguishable, because they lack the federal court jurisdiction provision found in the USWA.  Syngenta also notes that the Supreme Court has found a private right of action pursuant to other statutes,

28

notwithstanding a provision granting an administrative agency "exclusive jurisdiction," because such provisions did not limit the jurisdiction of the courts. Syngenta also argues that the authorization in the regulation for an action by "a person" cannot be read to be limited to producers or growers, because Congress has recognized the increasing development of biotechnologically altered grains. Thus, Syngenta argues that buyers and sellers in transactions involving commodities include biotechnology companies like Syngenta, who thus fall within the scope of "persons" authorized to pursue a private action under the USWA.

In its surreply, Bunge points out that the Supreme Court case cited by Syngenta as involving statutes addressing jurisdiction that purportedly suggested a private right of action actually involved a pre-existing statutory right to a private right of action, so that an amendment by Congress specifically adding a jurisdictional provision demonstrated an intent to preserve a pre-existing right for a private action. Bunge also reiterates that there is no rights-creating language in the USWA as to § 247, and the regulation cannot authorize what the statute does not. Bunge also reiterates that, even if the statute did create a private right of action, Syngenta is not among the persons or entities that would have a right to enforce the USWA, because it is not a depositor, purchaser, or receipt holder.

In its eleventh-hour brief offering new arguments, filed nearly a month after its Complaint and Motion For Preliminary Injunction, Syngenta asserts that the scope of the private right of action authorized by § 245(d) is necessarily as broad as the Act itself: It includes a private right of action with respect to a violation of any section of the USWA, including § 247(a). Syngenta argues that § 245(d) contemplates a suit by any person for "breach of any obligation arising under this chapter [*i.e.*, the USWA] for which a bond or other financial assurance has been obtained as required by this section"; that the phrase "any obligation. . . for which a bond or other financial assurance has been obtained as

29

required by this section" is defined, in turn, by reference to § 245(a); that § 245(a) specifies that the bond or other financial assurance is provided "to secure the person's performance of the activities . . . licensed or approved [under the USWA]"; and that "performance of the activities . . . licensed or approved [under the USWA]" (or secured obligations) include all of the statutory and regulatory obligations under the USWA, including those in § 247(a). Syngenta also argues that the Licensing Agreement contains requirements identical to the mandates of 7 U.S.C. § 247(a), so that Bunge's refusal to accept Viptera corn not only violates 7 U.S.C. § 247(a), but also breaches § E-5(A) of the Licensing Agreement. Syngenta argues that it is an appropriate third-party beneficiary of this agreement.

In its response to Syngenta's eleventh-hour arguments, Bunge argues that a statute conferring jurisdiction is not the same as a statute authorizing a private right of action. Moreover, Bunge argues that nothing in § 245(d) authorizes an action for equitable relief, such as a preliminary injunction. Even if § 245(d) creates a private right of action, Bunge argues that Syngenta is not a person "storing or seeking to store grain," so that it lacks "prudential" standing to pursue a USWA claim. Bunge also argues that § 245(d) plainly allows third parties—such as depositors—to whom Bunge owes an obligation under a contract and to whom the bond secures an obligation to sue with respect to the bond, but it is not a blanket authorization for any and all private suits for violations of the USWA. Bunge argues that, because the USWA provides that statutory violations by regulated warehouses are to be enforced exclusively by the Secretary, congressional intent to preclude private actions is clear. The exception to the Secretary's enforcement power for third-party actions with respect to the bond for breaches of obligations for which a bond or other financial assurance has been obtained, Bunge argues, secures Bunge's obligation to the United States and its obligations to depositors under contracts with them. Bunge

30

asserts that, if any person could sue under the bond for Bunge's obligations to the United States, it would be an end run around the enforcement provisions allowing the Secretary to suspend a warehouse license or impose additional penalties, and make the limiting language for actions "with respect to the bond" superfluous.   Bunge also disputes Syngenta's assertion that it is a third-party beneficiary of Bunge's License Agreement, because Syngenta is neither an intended third-party beneficiary of the License Agreement nor within an identifiable class of third-party beneficiaries, where there is no language suggesting that the License Agreement is intended for Syngenta's direct benefit.

> ### b.   Analysis

> ### i.   Purpose and provisions of the USWA.   One of the purposes of the United States Warehouse Act (USWA), 7 U.S.C. § 241 *et seq.*, "is to protect producers and others who store their property in public warehouses." *Appley Bros. v. United States*, 164 F.3d 1164, 1174 (8th Cir. 1999).   When the USWA was originally enacted in 1916, Congress recognized that grain warehousing was an area of traditional state concern, so that the federal regulation in this field was made subservient to state regulation. *Heart of Am. Grain Inspection Serv., Inc. v. Missouri Dep't of Agric.*, 123 F.3d 1098, 1103 (8th Cir. 1997) (citing *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 222 (1947)).   However, "the Act was amended in 1931 and now provides that, although the Secretary of Agriculture has authority to cooperate with states in the enforcement of state warehouse laws, 'the power, jurisdiction, and authority conferred upon the Secretary of Agriculture under this chapter shall be exclusive with respect to all persons securing a license hereunder so long as said license remains in effect.'" *Id.* (quoting 7 U.S.C. § 269

(1994)).[7]   The Eighth Circuit Court of Appeals noted that this language "portended preemption" of state warehousing laws, *id.*, and, indeed, concluded that, while certain aspects of the grain warehousing industry are subject to state law pursuant to certain provisions of the USWA, grain weighing and supervision are not among them.  *Id.* at 1104.  Aspects of the grain warehousing industry not left subject to state law by the USWA, the court held, are preempted by the USWA.  *Id.*

The provision of the USWA that is the basis for Syngenta's cause of action provides as follows:

### § 247. Fair treatment in storage of agricultural products

(a) In general
Subject to the capacity of a warehouse, a warehouse operator shall deal, in a fair and reasonable manner, with persons storing, or seeking to store, an agricultural product in the warehouse if the agricultural product—

(1) is of the kind, type, and quality customarily stored or handled in the area in which the warehouse is located;

(2) is tendered to the warehouse operator in a suitable condition for warehousing; and

(3) is tendered in a manner that is consistent with the ordinary and usual course of business.

---

[7] Section 269 was omitted in the general revision of the pertinent subchapter in 2000.  *See* Pub.L. 106-472, Title II, § 201, Nov. 9, 2000, 114 Stat. 2061.  However, as noted below, the Secretary's exclusive power, jurisdiction, and authority, to the extent of the chapter, is now codified at 7 U.S.C. § 242, with enforcement powers set out in 7 U.S.C. § 254.

> (b) Allocation
> Nothing in this section prohibits a warehouse operator from
> entering into an agreement with a depositor of an agricultural
> product to allocate available storage space.

7 U.S.C. § 247.   Notable by its absence is any language authorizing a private right of
action to enforce this provision of the USWA.   This provision, thus, stands in stark
contrast to a preceding provision, 7 U.S.C. § 245, providing bonding and other financial
assurance requirements, which is the only provision of the USWA expressly providing for
third-party actions, as follows:

> (d) Third party actions
> Any person injured by the breach of any obligation arising
> under this chapter for which a bond or other financial
> assurance has been obtained as required by this section may
> sue with respect to the bond or other financial assurance in a
> district court of the United States to recover the damages that
> the person sustained as a result of the breach.

7 U.S.C. § 245(d).

Another provision of the Act establishes the powers of the Secretary of Agriculture,
in pertinent part, as follows:

> (a) In general
> The Secretary shall have exclusive power, jurisdiction, and
> authority, to the extent that this chapter applies, with respect
> to—
>
> > (1) each warehouse operator licensed under this
> > chapter;
> >
> > (2) each person that has obtained an approval to engage
> > in an activity under this chapter; and

> (3) each person claiming an interest in an agricultural product by means of a document or receipt subject to this chapter.

7 U.S.C. § 242(a).  Another provision provides for penalties for noncompliance levied by the Secretary, as follows:

> If a person fails to comply with any requirement of this chapter (including regulations promulgated under this chapter), the Secretary may assess, on the record after an opportunity for a hearing, a civil penalty—
>
> (1) of not more than $25,000 per violation, if an agricultural product is not involved in the violation; or
>
> (2) of not more than 100 percent of the value of the agricultural product, if an agricultural product is involved in the violation.

7 U.S.C. § 254.  Finally, at least for present purposes, the USWA provides for jurisdiction and arbitration, as follows:

> (a) Federal jurisdiction
> A district court of the United States shall have exclusive jurisdiction over any action brought under this chapter without regard to the amount in controversy or the citizenship of the parties.
>
> (b) Arbitration
> Nothing in this chapter prevents the enforceability of an agreement to arbitrate that would otherwise be enforceable under chapter 1 of Title 9.

7 U.S.C. § 255.

The only USDA regulation pursuant to the USWA that the parties have identified as pertinent here provides as follows:

**§ 735.9 Dispute resolution and arbitration of private parties.**

(a) A person may initiate legal action in any court of competent jurisdiction concerning a claim for noncompliance or an unresolved dispute with respect to activities authorized under the Act.

(b) Any claim for noncompliance or an unresolved dispute between a warehouse operator or provider and another party with respect to activities authorized under the Act may be resolved by the parties through mutually agreed-upon arbitration procedures or as may be prescribed in the applicable licensing or provider agreement. No arbitration determination or award will affect DACO's authority under the Act.

(c) In no case will USDA provide assistance or representation to parties involved in an arbitration proceeding arising with respect to activities authorized under the Act.

7 C.F.R. § 735.9.[8]

*ii.*    *Courts to consider a private right of action under the USWA*. The parties and I have found only two decisions expressly addressing the question of whether or not the USWA provides a private right of action for an alleged violation of its provisions. However, neither involves extensive analysis of the question of whether the USWA generally provides a private right of action or the more specific question of whether § 247 (or § 247 via § 245(d)) creates a private right of action. Thus, neither is particularly helpful on the issues before me. To put it another way, I cannot simply accept the

---

[8]DACO is the Deputy Administrator, Commodity Operations, Farm Service Agency, USDA. *See* 7 C.F.R. § 735.2.

35

reasoning of one decision or the other to resolve the questions before me.   Nevertheless, I will examine those decisions for whatever guidance they may provide.

Thirty-five years ago, the Seventh Circuit Court of Appeals adopted the following conclusion of the district court in the case below:

> [The USWA] is a regulatory statute which provides for the licensing of those public warehouses engaged in the storage of agricultural products.   To enforce the provisions of the statute the Secretary of Agriculture is authorized to bring a penal action against the alleged violator.   7 U.S.C. Sec. 270.
>
> Although the Act does provide that the owner of the agricultural products in question may be reimbursed from any fine imposed by a Court, the Act does not authorize a private party to bring a direct action.   The aggrieved private party must bring the action through the Secretary of Agriculture. Accordingly, in the instant case, the plaintiffs were not authorized to sue under the United States Warehouse Act and those allegations relating to the Act must be dismissed.

*Pacific Trading Co. v. Wilson & Co., Inc.*, 547 F.2d 367, 370 (7th Cir. 1976) (district court's decision, attached as an appendix to the appellate decision); *see also id.* at 368 (adopting the grounds and rationale of the district court's decision).   In *Pacific Trading Company*, the court noted that "in the United States Warehouse Act it is the Secretary of Agriculture who is to enforce the provisions of the Act." *Pacific Trading Co.*, 547 F.2d at 370 (citing 7 U.S.C. § 241, but the Secretary's enforcement powers are now specified in §§ 242 and 254).   Because enforcement power resided with the Secretary, the court concluded that neither the USWA, nor the other statutes at issue in that case, created a private right of action for money damages, and neither the legislative intent nor the statutory purposes of the USWA justified a reading that a private cause of action for the types of actions at issue in that case existed or should exist. *Id.* at 371.   Instead, the court

held, the purpose of the USWA was licensing and regulatory, with enforcement in the hands of the Secretary.  *Id.*

As the parties recognize, however, the provision providing for enforcement authority of the Secretary cited in *Pacific Trading Company* has since been omitted in amendments to the USWA in 2000.  *See* Pub.L. 106-472, Title II, § 201, Nov. 9, 2000, 114 Stat. 2061.  The Secretary's enforcement powers are now detailed in §§ 242 and 254.

On the other hand, in a much more recent, albeit unpublished decision, in *Allenberg Cotton Co. v. Staple Cotton Cooperative Association*, 2009 WL 1619950 (N.D. Miss. June 9, 2009), the district court held, "Private causes of action for violations of the USWA are permitted by the regulations promulgated by the Secretary of Agriculture, in whom Congress placed exclusive power, jurisdiction, and authority with respect to warehousemen licensed under the USWA."  2009 WL 1619950 at *5 (citing 7 U.S.C. § 242(a) and 7 C.F.R. § 735.9(a)).  That was the extent of the court's analysis of the question, however.

It should be noted that neither *Pacific Trading Company* nor *Allenberg Cotton Company* involved alleged violations of § 247.  Rather, in *Pacific Trading Company*, the statutory provision allegedly violated was § 270, since omitted from the USWA, but the claim was "bottomed upon an alleged breach of a meat product sales contract by the defendants-appellees through individual and in concert acts."  *Pacific Trading Co.*, 547 F.2d at 368.  In *Allenberg Cotton Company*, the provisions of the USWA at issue were §§ 249 (transfer of stored agricultural products), 250 (warehouse receipts), and 251 (conditions for delivery of agricultural products).  *Allenberg Cotton Co.*, 2009 WL 1619950 at *5-*6.

Thus, these cases do little more than demonstrate that whether or not the USWA creates a private right of action is an unsettled question.

*iii.*     *Congressional authorization of private rights of action.*  A federal court simply does not have the power to recognize a cause of action to enforce a federal statute without congressional authorization.  As I observed some time ago, "[U]nder out tripartite system of government, it is for Congress, not the federal courts, to make such policy choices.  The role of the federal courts, of course, is as interpreters of the words chosen by Congress, not as policy makers or enlargers of congressional intent." *Furrer v. Brown*, 62 F.3d 1092, 1102 (8th Cir. 1995) (Bennett, District Judge, concurring) (citations and internal quotation marks omitted).

More specifically,

> Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress.  *Touche Ross & Co. v. Redington*, 442 U.S. 560, 578, 99 S. Ct. 2479, 61 L. Ed. 2d 82 (1979) (remedies available are those "that Congress enacted into law").  The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy.  *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 15, 100 S. Ct. 242, 62 L. Ed. 2d 146 (1979).  Statutory intent on this latter point is determinative. *See, e.g., Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1102, 111 S. Ct. 2749, 115 L. Ed. 2d 929 (1991); *Merrell Dow Pharmaceuticals Inc. v. Thompson*, 478 U.S. 804, 812, n. 9, 106 S. Ct. 3229, 92 L. Ed. 2d 650 (1986) (collecting cases).  Without it, a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute. *See, e.g., Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 145, 148, 105 S. Ct. 3085, 87 L. Ed. 2d 96 (1985); *Transamerica Mortgage Advisors, Inc. v. Lewis, supra*, at 23, 100 S. Ct. 242; *Touche Ross & Co. v. Redington, supra*, at 575-576, 99 S. Ct. 2479.  "Raising up causes of action where a statute has not created them may be

> a proper function for common-law courts, but not for federal tribunals." *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 365, 111 S. Ct. 2773, 115 L. Ed. 2d 321 (1991) (SCALIA, J., concurring in part and concurring in judgment).

*Alexander v. Sandoval*, 532 U.S. 275, 286-87 (2001); *see also Astra USA, Inc. v. Santa Clara County, Cal.*, ___ U.S. ___, ___, 131 S. Ct. 1342, 1347 (2011) ("'[R]ecognition of any private right of action for violating a federal statute,' currently governing decisions instruct, 'must ultimately rest on congressional intent to provide a private remedy.'" (quoting *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1102 (1991), and also citing *Stoneridge Investment Partners, LLC v. Scientific–Atlanta, Inc.*, 552 U.S. 148, 164 (2008), and *Sandoval*, 532 U.S. at 286).

As the Eighth Circuit Court of Appeals has explained, whether or not a statute provides a private right of action depends upon construction of the statutory provision at issue. *See Freeman v. Fahey*, 374 F.3d 663, 665 (8th Cir. 2004); *MM&S Fin., Inc. v. National Ass'n of Sec. Dealers, Inc.*, 364 F.3d 908, 910 (8th Cir. 2004). More specifically,

> In construing [the statute], we ask "whether Congress intended to create the private right of action asserted" by [the claimant]. *[Touche Ross & Co. v.] Redington*, 442 U.S. [560,] 568, 99 S. Ct. 2479 [(1979)]. We recognize that just because "a federal statute has been violated and some person harmed does not automatically give rise to a private cause of action in favor of that person." *Id.* (quoting *Cannon v. Univ. of Chicago*, 441 U.S. 677, 688, 99 S. Ct. 1946, 60 L. Ed. 2d 560 (1979)). "The ultimate question is one of congressional intent, not one of whether this Court thinks that it can improve upon the statutory scheme that Congress enacted into law." *Id.* at 578, 99 S. Ct. 2479.

*Freeman*, 374 F.3d at 665; *MM&S*, 364 F.3d at 910.

The following factors, from *Cort v. Ash*, 422 U.S. 66, 78 (1975), provide evidence of Congress's intent to create a private right of action:  (1) whether the plaintiff is a member of the class for whose benefit the statute was enacted; (2) whether Congress intended, explicitly or implicitly, to create such a remedy; (3) whether a private remedy is consistent with the underlying legislative scheme; and (4) whether a private right based on a federal statute would interfere with an area relegated to state law.  *Wisdom v. First Midwest Bank, of Poplar Bluff*, 167 F.3d 402, 407-408 (8th Cir. 1999) (citing *Cort*, 422 U.S. at 78, but noting "the *Cort* factors have been limited to providing evidence of Congress's intention to create a private right of action," citing *Thompson*, 484 U.S. at 189 (Scalia, J., concurring), in turn indicating *Cort* was essentially overruled by *Touche Ross & Co. v. Redington*, 442 U.S. 560 (1979), and also citing *Furrer v. Brown*, 62 F.3d 1092, 1100 (8th Cir. 1995), as noting that *Cort* is only a guide to determining congressional intent, citing *Thompson* and *Touche Ross*).  As to whether Congress intended, explicitly or implicitly, to create such a remedy, the Court in *Sandoval* stated, "Statutes that focus on the person regulated rather than the individuals protected create 'no implication of an intent to confer rights on a particular class of persons.'"  *Sandoval*, 532 U.S. at 289 (quoting *California v. Sierra Club*, 451 U.S. 287, 294 (1981)).

In *Freeman*, the statute in question stated, "'No person in the United States shall on the ground of race . . . or sex be excluded from participation in, be denied the benfits of, or be subjected to discrimination under any program . . . funded . . . with funds made available under this chapter.'"  *Id.* (quoting 42 U.S.C. § 5309).  As the court explained,

> We conclude the statute does not evince Congress's intent to provide a private remedy.  *See Gonzaga Univ. v. Doe*, 536 U.S. 273, 284, 122 S. Ct. 2268, 153 L. Ed. 2d 309 (2002) (even when statute contains rights-creating language, a plaintiff must still show "the statute manifests an intent 'to create not

just a private right but also a private remedy'") (quoting *Alexander v. Sandoval*, 532 U.S. 275, 286, 121 S. Ct. 1511, 149 L. Ed. 2d 517 (2001)). Rather, section 5309 provides for administrative enforcement of the anti-discrimination provisions by the Secretary of Housing and Urban Development, and for judicial enforcement through a civil action by the Attorney General, suggesting Congress intended to place enforcement in the hands of the Secretary, rather than private parties. *See* 42 U.S.C. § 5309(b), (c); *Alexander*, 532 U.S. at 290, 121 S. Ct. 1511 (express provision of one means of enforcing substantive rule suggests Congress intended to preclude other means of enforcement; suggestion may be so strong as to overcome other language in statute that could support finding a private right of action).

*Freeman*, 374 F.3d at 665. The court noted that, even though implementing regulations "mention" a right to file a civil action, "the regulations could not create a private right of action because regulations 'may not create a right that Congress has not.'" *Id.* at 665 n.2 (quoting *Alexander*, 532 U.S. at 291, and citing *Redington*, 442 U.S. at 577 n.18, to the effect that the statute must control).

iv. ***Whether § 247 creates a private right of action***. I conclude that § 247 of the USWA, standing alone, does not expressly or implicitly create a private right of action for its violation. *See Wisdom*, 167 F.3d at 407-408 (identifying this as the second factor in the congressional intent analysis, citing *Cort*, 422 U.S. at 78). Unlike the statute at issue in *Freeman*, which was cast in terms of protection of *individuals* from discrimination, but still did not create a *remedy* for a violation of its terms, the statute at issue here is one step further removed from rights-creating language for individual claimants, because it is cast in terms of what the warehouse operator must do, *i.e.*, it creates an affirmative duty on the warehouse operator, not a right of the person warehousing goods with the warehouse operator. *See* 7 U.S.C. § 247(a) ("Subject to the capacity of a warehouse, a warehouse

41

operator shall deal, in a fair and reasonable manner, with persons storing, or seeking to store, an agricultural product in the warehouse if the agricultural product [meets certain requirements.]").  The parties have cited no cases, and I have found none, holding that a statute using similar language created a private right of action.  Thus, § 247, which focuses on the person regulated rather than the individuals protected, does not authorize a private right of action.  *Sandoval*, 532 U.S. at 289 ("Statutes that focus on the person regulated rather than the individuals protected create 'no implication of an intent to confer rights on a particular class of persons.'" (quoting *Sierra Club*, 451 U.S. at 294).

Moreover, even if I were otherwise convinced that § 247 implicitly created a private right of action for its violation, I would still conclude that Syngenta is not a member of the class for whose benefit the statute was enacted.  *See Wisdom*, 167 F.3d at 407-408 (identifying this as the first factor in the congressional intent analysis (citing *Cort*, 422 U.S. at 78)).  Section 247(a) identifies the members of the class to whom its protections run as "persons storing, or seeking to store, an agricultural product in the warehouse." 7 U.S.C. § 247(a).  Syngenta is not such a person, but an entity that sells seeds for agricultural products to persons who ultimately grow and may store or seek to store that agricultural product.

In other respects, § 247, like the statute at issue in *Freeman*, fails to evince any congressional intent to provide a private *remedy*.  *See Freeman*, 374 F.3d at 665.  Even supposing § 247 impliedly creates a private right to have a warehouse operator fulfill its duty to act reasonably, it evinces no intent that any one other than the Secretary of Agriculture will enforce that duty, because, like the statute at issue in *Freeman*, the USWA provides for administrative enforcement of its provisions, in §§ 242 and 254, "suggesting Congress intended to place enforcement in the hands of the Secretary, rather than private parties."  *Id.*; *see also Alexander*, 532 U.S. at 290 (finding that express provision of one

42

means of enforcing substantive rules suggests that Congress intended to preclude other means of enforcement).  In other words, a private right of action to enforce § 247 is *not* consistent with the underlying legislative scheme.  *Wisdom*, 167 F.3d at 407-408 (identifying consistency with the underlying legislative scheme as the third *Cort* factor, citing *Cort*, 422 U.S. at 78).[9]

Moreover, 7 C.F.R. § 735.9(a) cannot create a private right of action for violation of § 247 that the statute does not.  *See id.* at 665 n.2.  Indeed, to the extent that the regulation relates to a private right of action, it plainly relates to the provision of the USWA that *expressly* provides for a private right of action, 7 U.S.C. § 245(d).  The same is true of the "jurisdictional" provision in the statute, 7 U.S.C. § 255, which logically relates to the provision that expressly does provide a private right of action, and also relates to enforcement actions by the Secretary.  As Bunge points out, the Supreme Court has recognized that a "jurisdictional" provision, conferring jurisdiction on the courts of the United States or any state, does not itself create a private cause of action, but simply confirms jurisdiction for a pre-existing right of action established elsewhere in the statute. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 387-88 (1982). Here, the pre-existing right of action is defined in § 245(d), so that § 255 relates to jurisdiction over that right of action, not over a private right of action under § 247, which lacks any language creating such a right.  Furthermore, the existence of express language creating a private right of action under one provision of the USWA, § 245, also strongly

---

[9]I find that there is no concern that a private right based on the federal statute would interfere with an area regulated by state law, *see Wisdom*, 167 F.3d at 407-408 (identifying this as the fourth *Cort* factor), where the USWA preempts state law in the respects pertinent here.  *See Heart of Am. Grain Inspection Serv., Inc.*, 123 F.3d at 1103.  This factor does not tip the balance in favor of recognizing a private cause of action here, absent some showing of congressional intent.

suggests that, when such express language is lacking in another provision, § 247, there was no such intent to create a private right of action for violation of the latter provision. *See MM&S*, 364 F.3d at 911 (noting that Congress knows how to create a private right of action when it wants to, and where it has done so for some provisions of an act, such as the Exchange Act, the failure to use such specific language for violations of another section suggests that Congress had no such intent as to that section).

> *v.        Whether § 245(d) creates a private right of action for violation of § 247*.

Syngenta argues, however, that it is precisely the existence of the express authorization for a private right of action in § 245(d) that authorizes a private right of action for a violation of § 247, and § 255 establishes jurisdiction in the federal courts over such an action. This eleventh-hour argument ultimately is no more convincing than its predecessors.

Again, Syngenta's argument is that the scope of the private right of action authorized by § 245(d) is necessarily as broad as the Act itself, because § 245(d) contemplates a suit by any person for "breach of any obligation arising under this chapter [*i.e.*, the USWA] for which a bond or other financial assurance has been obtained as required by this section"; that the phrase "any obligation. . . for which a bond or other financial assurance has been obtained as required by this section" is defined, in turn, by reference to § 245(a); that § 245(a) specifies that the bond or other financial assurance is provided "to secure the person's performance of the activities . . . licensed or approved [under the USWA]"; and that "performance of the activities . . . licensed or approved [under the USWA]" (or secured obligations) include all of the statutory and regulatory obligations under the USWA, including those in § 247(a). Syngenta also argues that the Licensing Agreement contains requirements identical to the mandates of 7 U.S.C. § 247(a), so that Bunge's refusal to accept Viptera corn not only violates 7 U.S.C. § 247(a), but also breaches § E-5(A) of the Licensing Agreement.

Even supposing that § 245(d) evinces congressional intent to authorize a private cause of action for a violation of § 247(a), because the obligations under § 247(a) are purportedly secured by the bond, *see Wisdom*, 167 F.3d at 407-408 (second *Cort* factor), Syngenta still is not a member of the class for whose benefit the "action on the bond" provision was enacted, *see id.* (first *Cort* factor), as such an action would relate to the obligations under § 247(a), but obligations under § 247(a) are to depositors. Syngenta is not a depositor, but an entity that sells seeds for agricultural products to persons who ultimately grow and may store or seek to store that agricultural product. Moreover, the *remedy* contemplated by § 245(d) does not extend to equitable relief, such preliminary or permanent injunctive relief, but to *damages* against the bond, so that reading § 245(d) to authorize the private cause of action that Syngenta is asserting here is inconsistent with the legislative scheme. *Id.* (third *Cort* factor).

Finally, I found persuasive Bunge's argument, at the evidentiary hearing, that the bond itself, *see* Defendant's Exhibit AH (Warehouseman's Bond) (BNA 0002301-0002307), demonstrates that a private right of action "with respect to the bond" pursuant to § 245(d) is not broad enough to authorize Syngenta's private cause of action here. Bunge points to the following language of the bond:

> WHEREAS, the said Act [the USWA] provides that each warehouseman applying for a license to conduct a warehouse for the storage of the above-specified product(s) in accordance with the Act shall, as a condition to the granting of the license, execute and file with the Secretary of Agriculture a good and sufficient bond *to the United States to secure the faithful performance [1] of the obligations as a warehouseman under the terms of the Act and the regulations prescribed thereunder and [2] of such additional obligations as a warehouseman as may be assumed by the warehouseman under*

> *contracts with the respective depositors* of the above-specified product(s) in such licensed warehouse(s).

Defendant's Exhibit AH at BNA 0002302 (emphasis and bracketed numbers added). Bunge argues that, because the USWA gives *the Secretary* enforcement power with some "teeth" in 7 U.S.C. § 254, and the bond is in favor of the United States, the purpose of the bond is, first, to provide a source of funds for the penalties that can be imposed *by the Secretary* pursuant to § 254, if the warehouse is out of business or otherwise unable to pay those penalties. Because the bond then recites that it is also to secure "additional obligations" assumed under contracts with depositors, Bunge argues that the bond runs in favor of the depositors with whom the warehouseman makes deals. This scheme, Bunge argues, prevents the nightmare of private rights of action, for example, because the warehouse is not keeping proper records, while leaving depositors with a private right of action with regard to their contracts, for which there is a bond to ensure the warehouse's financial capacity to satisfy a judgment. In short, in Bunge's view, § 245(d) provides that, if a person has a claim for damages arising out of an assurance under the bond, or involving an assurance under the bond, then that person has a cause of action. Allowing a depositor to have a private cause of action so limited, Bunge argues, is entirely consistent with the enforcement scheme that does not involve private rights of action except within a narrow area identified in § 245(d) and the bond.

Syngenta counters that Bunge's argument is not based on what § 245(d) says, because that statute does not say that the private cause of action is limited to a depositor's claim arising under contract. Syngenta points out that § 245(d) says "any person injured" may bring suit. Thus, Syngenta argues that the bond secures injured persons as well as the United States and secures faithful performance of the entire Act.

46

I find that Bunge has the better side of this argument, because Bunge's argument takes into account the specific language of § 245(d) which authorizes not just any action by "any person injured" in any way, but an action by "any person injured" "with respect to the bond or other financial assurance" for "the breach of any obligation arising under this chapter for which a bond or other financial assurance has been obtained as required by this section." The obligations expressly secured by the bond are (1) "the obligations as a warehouseman under the terms of the Act and the regulations prescribed thereunder," and (2) "such additional obligations as a warehouseman as may be assumed by the warehouseman under contracts with the respective depositors." Defendant's Exhibit AH at 0002302. Consistent with the legislative scheme, the first kind of obligations secured by a bond running to the United States, those under the terms of the Act and regulations, may be enforced by the Secretary pursuant to §§ 242 and 254, while the second kind of obligations, the contractual obligations, may be enforced by a depositor. Moreover, as explained above, even if the obligations imposed by § 247(a) were the subject of a private right of action pursuant to § 245(d), and jurisdiction in federal courts over such actions were authorized by § 255, the obligations imposed in § 247(a) run to depositors, not to seed producers, so that a seed producer, such as Syngenta, is not a member of the class for whose benefit the "action with respect to the bond" provision was enacted.

Syngenta has failed to show that § 247, or § 247 via § 245(d) and § 255, expressly or impliedly creates a private right of action that it may pursue. Where there is no private right of action for violations of § 247, Syngenta simply has no likelihood of success on that claim.

*vi.   Standing.* Furthermore, even if § 247, or § 247 via § 245(d) and § 255, creates a private cause of action, I find that Syngenta does not have standing to pursue such a claim, because neither § 247 nor § 245(d) nor § 255 can properly be understood as

47

granting persons in Syngenta's position a right to judicial relief. *See Warth v. Seldin*, 422 U.S. 490, 500 (1975) (stating the test for prudential standing to be "whether the . . . statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief"). As the Eighth Circuit Court of Appeals has explained,

> "Even if a plaintiff meets the minimal constitutional requirements for standing, there are prudential limits on a court's exercise of jurisdiction." *Ben Oehrleins & Sons & Daughter, Inc. v. Hennepin County*, 115 F.3d 1372, 1378 (8th Cir. 1997). One such prudential limitation is the requirement that "a litigant must assert his or her own legal rights and interest, and cannot rest a claim to relief on the legal rights or interests of third parties." *Powers v. Ohio*, 499 U.S. 400, 410, 111 S. Ct. 1364, 113 L. Ed. 2d 411 (1991).

*Jewell v. United States*, 548 F.3d 1168, 1172 (8th Cir. 2008). Here, whatever rights § 247 may confer, or § 245(d) and § 255 may confer, to enforce § 247 via a private cause of action, those rights are conferred upon *a party seeking to store agricultural products in the warehouse*, not upon a party who provided the seeds from which the person seeking to store the agricultural product grew that agricultural product. *See* 7 U.S.C. § 247(a) ("[A] warehouse operator shall deal, in a fair and reasonable manner, *with persons storing, or seeking to store*, an agricultural product in the warehouse. . . ." (emphasis added)). Syngenta is not trying to assert its own legal rights under the USWA, but *producers'* rights, so that it does not have standing. *Id.* For this additional reason, Syngenta has no likelihood of success on the merits of its USWA claim.[10]

---

[10] The answer to the questions of whether or not § 247, or § 247 via § 245(d) and § 255, provides a private right of action and whether the plaintiff had standing to assert such a claim might be different, if the plaintiff seeking to assert the private cause of action

(continued...)

*vii.*   *The merits*.   Finally, even if the private right of action and standing issues could be overcome, Syngenta *still* would have no likelihood of success on its USWA claim. The obligation imposed by § 247(a) is to deal "in a fair and reasonable manner" with "persons storing, or seeking to store, an agricultural product in the warehouse." 7 U.S.C. § 247(a).   I cannot say that Bunge's decision not to accept Viptera corn, even if the decision was made after planting, was so unfair or unreasonable as to be actionable. Producers (and certainly Syngenta) were on notice that transgenic traits might not be acceptable in all import markets for United States corn; Bunge made a legitimate business decision to export corn to China when the opportunity arose; and the circumstances of Bunge's "integration" of all of its facilities into its export business made it reasonable for Bunge to reject Viptera corn that was not approved for import in China at any of its facilities.   Thus, even strictly on the *merits*, Syngenta has no likelihood of success on its USWA claim.

### 2.   *The other warehousing claims*

Syngenta has also brought claims based on alleged violations of Iowa common-law and statutory duties of warehouse operators in **Count III**, as to Bunge warehouses that are not licensed under the USWA.   Bunge presented evidence that *all* of its warehouses are licensed under the USWA.   Certainly, no evidence was presented at the evidentiary hearing that any of Bunge's warehouses are *not* licensed under the USWA. Furthermore, it does not appear that § 247 left aspects of fair treatment in storage of agricultural products subject to state regulation.   Thus, I find that, as to any warehouse licensed under the USWA, Syngenta's Iowa common-law and statutory claims are preempted.   *See Heart*

---

[10](...continued)

were a farmer who grew Viptera corn, but was not allowed to deliver it to a Bunge facility.

*of Am. Grain Inspection Serv., Inc.*, 123 F.3d at 1104.   Therefore, Syngenta has no likelihood of success on these claims, either.

### 3.     *Third-party beneficiary contract claim*

Before turning to Syngenta's likelihood of success on its original Lanham Act claim, I will consider Syngenta's likelihood of success on its new third-party beneficiary contract claim, which was only asserted in Syngenta's First Amended Complaint on the eve of the evidentiary hearing on its Motion For Preliminary Injunction.  It is appropriate to consider that new claim next, because that claim raises issues closely related to the USWA claim. Bunge asserts that Syngenta has no likelihood of success on this claim, either.

### a.     *Arguments of the parties*

Essentially, Syngenta argues that it is a third-party beneficiary of the Licensing Agreement between Bunge and the USDA and, therefore, it is entitled to sue Bunge for its non-compliance with the express terms of the Licensing Agreement pursuant to the express terms of that Agreement.  Syngenta points out that § E-5(A) of the Licensing Agreement, Defendant's Exhibit AH (BNA 0002308-0002351); *see also* First Amended Complaint, Exhibit 2, contains requirements identical to § 247(a).  Syngenta also points out that the Licensing Agreement provides for dispute resolution by "a person" in a "legal action in any district court of the United States concerning a claim for noncompliance or an unresolved dispute with respect to the activities authorized under the USWA." *Id.* at 36 § M.  Syngenta points out that Bunge could have chosen not to be licensed under the USWA, but when Bunge agreed to be, it also reasonably agreed to the obligations of its Licensing Agreement, including the obligation to treat growers in a fair and reasonable manner.  Syngenta also argues that enforcement under the USWA is "decentralized," because a private cause of action is authorized in 7 U.S.C. § 245(d).  Syngenta argues that the *quid pro quo* for Bunge's opportunity to participate in the grain-handling market and

make money is that Bunge has agreed that other market participants are permitted to ensure that Bunge plays by the rules.

Bunge denies that Syngenta is a third-party beneficiary of Bunge's Licensing Agreement, because Syngenta is neither an intended third-party beneficiary nor within an identifiable class of third-party beneficiaries. Bunge argues that Syngenta has failed to identify any provision of the Licensing Agreement that clearly expresses that the License Agreement was intended for Syngenta's direct benefit or even for its indirect benefit. Bunge points out that § E-5(A) requires Bunge to deal fairly and reasonably with "persons storing or seeking to store grain," but Syngenta is not such a person, and § M(1) merely states that a person may initiate legal action for non-compliance or an unresolved dispute, but does not thereby identify or suggest that seed manufacturers in general are persons for whose benefit the Licensing Agreement was executed.

### b.   *Analysis*

Under Iowa law, "[t]he primary question in a third-party beneficiary case is 'whether the contract manifests an intent to benefit a third party.'" *RPC Liquidation v. Iowa Dep't of Transp.*, 717 N.W.2d 317, 319-20 (Iowa 2006) (quoting *Midwest Dredging Co. v. McAninch Corp.*, 424 N.W.2d 216, 224 (Iowa 1988)); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 302. The intent need not be to benefit a third-party directly, however. *Id.* at 320. Intent is determined by looking at the language of the contract and the circumstances surrounding it. *Id.* Similarly, the United States Supreme Court recently explained that "[a] nonparty becomes legally entitled to a benefit promised in a contract . . . only if the contracting parties so intend." *Astra USA, Inc. v. Santa Clara County, Cal.*, ___ U.S. ___, ___, 131 S. Ct. 1342, 1347 (2011) (citing RESTATEMENT (SECOND) OF CONTRACTS § 302(1)(b) (1979)). In *Astra*, the United States Supreme Court held that, where an agreement simply incorporated statutory obligations and recorded the

51

private entity's agreement to abide by those obligations, the agreement merely served as a means by which the private entity could "opt into the statutory scheme," and, therefore, a third-party suit to enforce the agreement would be "in essence a suit to enforce the statute itself." *Id.* at 1348. However, the Court concluded, "The absence of a private right to enforce the statutory . . . obligations would be rendered meaningless if [third-party] entities could overcome that obstacle by suing to enforce the contract's . . . obligations instead." *Id.* In such circumstances, "[t]he statutory and contractual obligations, in short, are one and the same," and a third-party beneficiary action would be inconsistent with the legislative scheme. *Id.* Spreading the enforcement burden between government agencies and private entities is not what Congress contemplates when it centralizes enforcement of a statute in the government. *Id.* at 1348-49.

I find no likelihood of success on Syngenta's third-party beneficiary contract claim. First, I find nothing in the Licensing Agreement directly stating or even indirectly hinting at an intent to benefit or to allow enforcement by third-party entities such as Syngenta, that is, producers of seeds used by others to grow agricultural products that might ultimately be stored in a licensed warehouse. *RPC Liquidation*, 717 N.W.2d at 319-20; *Astra*, ___ U.S. at ___, 131 S. Ct. at 1347; RESTATEMENT (SECOND) OF CONTRACTS § 302. The Licensing Agreement provisions cited by Syngenta both run, directly and indirectly, to the benefit of "persons storing or seeking to store grain." Licensing Agreement, § E-5(A). Section M of the Licensing Agreement does not widen the scope of "persons" who may initiate legal action in court, concerning a claim of noncompliance or an unresolved dispute with respect to activities authorized under the Licensing Agreement, where the underlying obligations at issue run only to "persons storing or seeking to store grain." Moreover, this is a circumstance in which enforcement of the Licensing Agreement, which Syngenta argues incorporates the statutory obligations of § 247(a), is precisely an attempt to enforce

the statute itself.  *Astra*, ___ U.S. at ___, 131 S. Ct. at 1348.  Contrary to Syngenta's arguments, for the reasons explained above, I do not find a private right to enforce the statutory obligations themselves, so that allowing those obligations to be enforced in the guise of a third-party contract action would render meaningless the absence of a statutory private right of action.  *Id.*  Instead, enforcement of the USWA *is* "centralized" with the Secretary of Agriculture, with the exception of private actions authorized by § 245(d), over which federal courts have jurisdiction pursuant to § 255, and those actions do not extend to Syngenta's present complaints about Bunge's purported noncompliance with § 247(a).  *Id.*

Because Syngenta has no more likelihood of success on this eleventh-hour claim than it did on its other warehousing claims, this claim does not enhance Syngenta's prayer for preliminary injunctive relief.

### 4.     The Lanham Act claim

Syngenta also asserts that it has sufficient likelihood of success on its Lanham Act claim, pursuant to 15 U.S.C. § 1125(a)(1)(B), to obtain preliminary injunctive relief.  Bunge disagrees.

#### a.     Arguments of the parties

Syngenta argues that Bunge has violated § 1125(a)(1)(B), because, contrary to the statements in its Policy, Bunge is capable of accepting Viptera-produced grain.  Syngenta asserts that the falsity of Bunge's assertion that it is "unable" to accept Viptera corn is that other large grain buyers and elevators are accepting Viptera-produced grain and individual Bunge elevators have admitted that they are capable of accepting Viptera-produced grain.  Syngenta also asserts that, contrary to Bunge's statement in its Policy, China is not a "major export market" for grain, either as identified by BIO and NCGA or in light of its share of the export market.  Syngenta also asserts that Bunge's statement in its Policy that

its facilities are interconnected into the export market, so that it rejects products not approved for United States export markets, is untrue, because much of the corn that Bunge receives stays in the United States. Syngenta asserts that Bunge would not even attempt to service its grain export contracts to China from every one of its elevators, so that there is no reason for every elevator to be "Viptera-free." Finally, Syngenta asserts that grain containing the Viptera trait is fully merchantable. Syngenta contends that Bunge's statements are misleading Syngenta's current and potential customers into believing that Viptera products are undesirable to growers.

Bunge argues that Syngenta has no likelihood of success on its Lanham Act claim, because the Lanham Act requires that, in order to be actionable, an allegedly false statement must be made in commercial advertising or promotion, *i.e.*, in commercial speech by one in competition with the plaintiff and with the intent to influence consumers to buy the defendant's good or services and sufficiently disseminated to constitute advertising. However, Bunge asserts that it is not in commercial competition with Syngenta and is not attempting to promote a competing product. Furthermore, Bunge asserts that its Policy and signs stating the Policy are not false or misleading. Bunge asserts that its statement that it is "unable to accept" Viptera corn must be read in the context of the stated explanation for the reason why this is so: Viptera has not received necessary international approval, which Bunge asserts is true, from major export destinations, which Bunge asserts is a protected opinion, in light of the fact that Bunge's facilities are interconnected into the export market, which Bunge also asserts is true. Bunge asserts that its characterization of China as a "major export market" is true, as a matter of fact, or at the very least, is a protected opinion, based on what it considers to be a major export market. Such a subjective opinion, Bunge contends, is not actionable under the Lanham Act.

In reply, Syngenta argues that it is likely to succeed on its Lanham Act claim, because the Eighth Circuit Court of Appeals has declined to hold that such a claim must be brought against a competitor.  While Syngenta acknowledges that the claim must involve "commercial speech," it contends that Bunge's Policy easily meets the test, requiring the speech to propose a commercial transaction, refer to a specific product or service, and relate to the speaker's economic motivations.  Here, Syngenta argues, first, that the Policy was physically posted at Bunge elevators and disseminated on the internet; second, it clearly refers to Syngenta's Viptera products; and, third, it relates to Bunge's economic motivation to protect its Chinese exports and make money.  Syngenta also argues that Bunge's Policy creates the kind of harm to commercial interests that § 1125 was intended to prevent.  Syngenta also asserts that, even if "commercial competition" is required, it is likely to succeed, again, because the Policy impinges upon commercial interests and creates the type of harm that legislators contemplated when drafting the Lanham Act.  This is so, Syngenta argues, because Bunge is not a disinterested, non-commercial party, but one that shares common customers with Syngenta.  Syngenta also reiterates that Bunge's posted Policy is literally false and misleading.  This is so, Syngenta argues, for example, because it incorrectly asserts that multiple export nations have not approved Viptera corn, when Bunge relies only on the lack of approval from China.

In its surreply, Bunge argues that, although the Eighth Circuit Court of Appeals declined to take sides on the "commercial competition" requirement in the case cited by Syngenta, it had previously expressly held that the Lanham Act requires that a false statement, to be actionable, must be made by a defendant who is in commercial competition with the plaintiff.  Where the later Eighth Circuit case did not decide the question, but resolved the case on other grounds, Bunge argues that the earlier case's holding necessarily prevails as governing law.  As to whether its Policy is misleading,

Bunge argues that, while its Policy refers to multiple export nations not yet having approved the products identified, the Policy identifies *two* products, Viptera corn and Plenish soybeans, and the latter is not approved in multiple foreign markets.

        ***b.***     ***Analysis***

Section 1125(a)(1)(B) of Title 15 of the United States Code, that is, section 43(a) of the Lanham Act, prohibits false advertising. *See American Ass'n of Orthodontists v. Yellow Book USA, Inc.*, 434 F.3d 1100, 1103 (8th Cir. 2006). Specifically, it provides as follows:

> **§ 1125. False designations of origin, false descriptions, and dilution forbidden**
>
> (a) Civil action
> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
>         * * *
>
> > (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(B).

The Eighth Circuit Court of Appeals noted,

> Applying prudential standing considerations, a number of circuits have held, categorically, that false advertising claims not involving misuse of a trademark are actionable only "when brought by competitors of the wrongdoer." *Waits [v. Frito-Lay, Inc.]*, 978 F.2d [1093,] 1109 [(8th Cir. 1992)]; *accord Telecom Intern. America, Ltd. v. AT & T Corp.*, 280 F.3d 175, 197 (2d Cir. 2001); *Stanfield v. Osborne Indus., Inc.*, 52 F.3d 867, 873 (10th Cir.), *cert. denied*, 516 U.S. 920, 116 S. Ct. 314, 133 L. Ed. 2d 217 (1995); *L.S. Heath & Son, Inc. v. AT & T Info. Sys., Inc.*, 9 F.3d 561, 575 (7th Cir. 1993). Other circuits have adopted a less categorical multi-factor test, based on the Supreme Court's test for antitrust standing, that focuses judicial enforcement of the Lanham Act on the protection of commercial interests and the prevention of competitive harm. *See Conte Bros. Auto., Inc. v. Quaker State-Slick 50, Inc.*, 165 F.3d 221, 233-35 (3d Cir. 1998), followed in *Procter & Gamble Co. v. Amway* Corp., 242 F.3d 539, 562-64 (5th Cir.), *cert. denied*, 534 U.S. 945, 122 S. Ct. 329, 151 L. Ed. 2d 243 (2001).

*American Ass'n of Orthodontists*, 434 F.3d at 1103-04. The court concluded that it did not need to resolve its position on the circuit conflict, because it held that the plaintiff otherwise lacked standing to assert a false advertising claim against the defendant under either test. *Id.* at 1104.

As Bunge asserts, the Eighth Circuit Court of Appeals apparently overlooked in *American Association of Orthodontists* its prior conclusion, in *Aviation Charter, Inc. v. Aviation Research Group/US*, 416 F.3d 864 (8th Cir. 2005), that "[f]or a statement to constitute commercial advertising or promotion, it must be made, *inter alia*, by a defendant who is in commercial competition with the plaintiff," and its holding in that prior case that the district court had correctly found that the plaintiff's Lanham Act action failed because the defendant was not in commercial competition with the plaintiff. *Aviation Charter*, 416 F.3d at 871. Syngenta does not attempt to show that Bunge is in commercial competition

with Syngenta, instead suggesting that the requirement can be overlooked, because its action would purportedly fit with the legislative purpose of § 1125(a)(1)(B) of the Lanham Act, where Syngenta and Bunge have customers in common. While Syngenta and Bunge have customers in common, their relations with those customers are at opposite ends of the grain production process—Syngenta and Bunge do not compete in either seed production or grain storage. Thus, Syngenta lacks any likelihood of success on its Lanham Act claim, if Bunge must be in commercial competition with Syngenta for that claim to lie.

Yet, even if the requirement is not commercial competition between the plaintiff and the defendant, but commercial speech by the defendant that injures the plaintiff, as Syngenta argues, Syngenta has no likelihood of success, because its contention that Bunge's Policy involves "commercial speech" is far too strained. The Eighth Circuit Court of Appeals has recognized that a "threshold requirement for Lanham Act liability" is "commercial speech." *Porous Media Corp. v. Pall Corp.*, 173 F.3d 1109, 1120 (8th Cir. 1999). "Three factors govern whether speech is commercial: (i) whether the communication is an advertisement, (ii) whether it refers to a specific product or service, and (iii) whether the speaker has an economic motivation for the speech." *Id.* To meet the first requirement, an "advertisement" is speech that "'proposed a commercial transaction.'" *Id.* (quoting *Cincinnati v. Discovery Network*, 507 U.S. 410, 423 (1993). In *Porous Media*, the Eighth Circuit Court of Appeals found that the speech in question met this requirement, because it urged readers to buy Pall's filter and not to buy Porous's. *Id.* at 1121. While Bunge's sign stating its Policy certainly *relates* to commercial transactions, it does not *propose* any transaction with Bunge (or any rejection of any transaction with Syngenta); rather, it is a statement that Bunge *will not* enter into transactions for delivery of Viptera corn. It is not enough, as Syngenta urges, to find that Bunge is not a disinterested, non-commercial party, but one that shares common customers

58

with Syngenta. That fact, even if true, does not establish that the speech in question proposes a commercial transaction.

For these reasons, Syngenta also has no likelihood of success on its Lanham Act claim that is sufficient to sustain the preliminary injunctive relief that it seeks.

### C. Irreparable Harm To Syngenta

"Likelihood of success" is "'meaningless in isolation . . . [and] must be examined in the context of the relative injuries to the parties and the public.'" *Roudachevski*, 648 F.3d at 706 (quoting *General Motors Corp. v. Harry Brown's L.L.C.*, 563 F.3d 312, 319 (8th Cir. 2009)); *accord Winter*, 555 U.S. at 23-24 (there is no need to reach the "likelihood of success" factor, if the balance of interests weighs against the injunction). Thus, even assuming that I am wrong, and that Syngenta has some or even significant likelihood of success on the merits of its various claims, I must still consider and balance the other *Dataphase/Winter* factors to decide whether or not to issue a preliminary injunction. I begin that balancing process by examining Syngenta's allegations of "irreparable harm." *See Winter*, 555 U.S. at 20; *Roudachevski*, 648 F.3d at 705 (citing *Dataphase*, 640 F.2d at 114).

#### 1. Arguments of the parties

Syngenta argues that its reputation and goodwill with the growers who use its products and the seed resellers who distribute them will be threatened if Bunge persists in its refusal to accept Viptera-produced grain. Syngenta asserts that loss of intangible assets, such as reputation and goodwill, can constitute irreparable injury. Syngenta argues that, because of Bunge's actions, its 12,000 growers of Viptera are being turned from a source of goodwill and future increased income into thousands of unhappy consumers who blame Syngenta because Bunge will not take their grain. Syngenta argues that the damage to its

reputation and goodwill is obvious.  Syngenta also argues that the financial impact of such harm is difficult to calculate with any certainty, given the number of factors that go into a farmer's decision to buy a particular seed.

Bunge did not appear to dispute either that Syngenta's goodwill and reputation are harmed, because of Bunge's rejection of Viptera corn, or that harm to reputation and goodwill is the sort of "irreparable" harm that might justify a preliminary injunction. Rather, Bunge focuses its attention on the "balance of harms," a factor considered separately, below.  Bunge does argue, however, that harm to Syngenta's goodwill or reputation is of Syngenta's own making, because Syngenta released Viptera corn for commercial production before obtaining import approval from China and other "major" importers of United States corn, such as the EU.

### 2.    *Analysis*

The movant must show that "he is likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20. In *Winter*, the Supreme Court clarified that, even where a plaintiff demonstrates a strong likelihood of prevailing on the merits, the plaintiff must do more than show a "possibility" of irreparable harm; rather, the proper standard "requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction." *Id.* at 22 (emphasis in the original) (rejecting as "too lenient" the "possibility" of irreparable harm standard used by the Ninth Circuit Court of Appeals and the district court in the case below).  "'Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages.'" *Rogers Group, Inc. v. City of Fayetteville, Ark.*, 629 F.3d 784, 789 (8th Cir. 2010) (quoting *General Motors Corp. v. Harry Brown's, L.L.C.*, 563 F.3d 312, 319 (8th Cir. 2009)).  The Eighth Circuit Court of Appeals has stated that, "[t]o succeed in demonstrating a threat of irreparable harm, 'a

60

party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief.'" *Roudachevski*, 648 F.3d at 706 (quoting *Iowa Utils. Bd. v. Federal Commc'ns Comm'n*, 109 F.3d 418, 425 (8th Cir.1996)).

Damages to reputation can constitute a threat of irreparable harm.  *Id.* at 707. Similarly, loss of goodwill among customers may be sufficient to establish a threat of irreparable harm.  *Rogers Group, Inc. v. City of Fayetteville, Ark.*, 629 F.3d 784, 789-90 (8th Cir. 2010) (citing *Medicine Shoppe Int'l, Inc. v. S.B.S. Pill Dr., Inc.*, 336 F.3d 801, 805 (8th Cir. 2003)).  I noted, above, in my statement of pertinent facts, that I have little doubt that, in the highly competitive corn seed business, Bunge's refusal to accept Viptera-produced grain will cause many farmers to question their decision to buy Viptera seed this year, and may cause them not to buy Syngenta products in future years.  I also have little doubt that it is difficult to determine the amount of lost sales that might follow from Bunge's refusal to accept Viptera corn, not least because of the other influences, such as weather, prices, and other factors, on a farmer's decision about what seed to plant. This is not to say, however, that Bunge's conduct, rather than Syngenta's own conduct, is necessarily the source of the threat of injury to Syngenta's goodwill or reputation.  At least to some extent, Syngenta's reputational injuries, though significant, are the result of *Syngenta's* decision to commercialize Viptera corn before obtaining import approval from significant import markets, including China, where Bunge's rejection of unapproved traits was not wholly unforeseen or unforeseeable, because Bunge and other elevators had rejected certain unapproved genetic varieties in the past.  Who should bear the risks of lack of full international import approval is a matter to which I will return, below, when I balance the harms.  For now, it does appear likely that the requested preliminary injunctive relief would alleviate some of Syngenta's reputational harm, and that such harm might continue or continue to threaten, in the absence of a preliminary injunction—at least if

61

Syngenta had some likelihood of success on the merits of its claims. *Winter*, 555 U.S. at 20.

### D.  Balance Of Equities

The next *Dataphase/Winter* factor is whether the balance of equities tips in favor of preliminary injunctive relief. *Winter*, 555 U.S. at 20; *Roudachevski*, 648 F.3d at 705-06 (stating the *Dataphase* factor as "the state of the balance between [the movant's irreparable] harm and the injury that granting the injunction will inflict on other parties" (citing *Dataphase*, 640 F.2d at 114)). "In each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Id*. at 24 (quoting *Amoco Production Co.*, 480 U.S. at 542). The parties take very different positions on how the balance of equities plays out in this case.

### 1.    Arguments of the parties

Syngenta argues that its threatened harm, in the absence of an injunction, is real and irreparable.  On the other hand, Syngenta argues that Bunge faces minimal risk, if it is enjoined to take down its signs and accept Viptera corn.  Syngenta argues that Bunge can handle Viptera corn separately from other grain and, indeed, because only a relatively small amount of corn is actually destined for export to China, it is fair and reasonable to require Bunge to take Viptera corn, because all corn for export to China could be drawn from just a few designated "Viptera-free" facilities.  Syngenta also argues that the balance of harms weighs in its favor, because Bunge's signs and Policy are not even effectively tailored to ensure that Bunge has Viptera-free corn to send to China.  Syngenta argues that the signs and Policy do nothing to prevent honest mistakes resulting in the delivery of

Viptera corn, and Bunge is not doing testing to ensure that all corn deliveries are Viptera-free.

Bunge counters that, because of its integrated or interconnected export system, if it is required to accept Viptera corn, it will no longer have the ability to mange its market risk appropriately and could be risking millions of dollars in liability for breach of its commitments to ship corn to China. At the hearing, Bunge also presented evidence of the very substantial costs involved in segregating Viptera corn at each of its facilities and the significant additional costs of redirecting shipments of corn, if China rejects them because of Viptera tainting. On the other hand, Bunge argues that Syngenta's harms are speculative at best, where Syngenta has already sold Viptera seed for this crop year, and any losses from Bunge's refusal to accept Viptera could not be determined for months, if at all. Bunge also asserts that Syngenta relies only on anecdotal evidence, not systematically obtained evidence, to support its contention that farmers may not buy Syngenta seed in the future, because of Bunge's refusal to accept Viptera corn. In short, Bunge argues that Syngenta is asking the court to impose a disproportionate share of the risk of harm on Bunge.

In reply, Syngenta asserts that Bunge is not currently making any effort to segregate Viptera corn, only likely ineffectual measures to communicate its intention to reject Viptera corn. Syngenta also argues that any harm to Bunge is of *Bunge's* making, because of Bunge's deviation from its own prior policy to accept Viptera corn without Chinese approval and after it had promised farmers that it would accept Viptera corn if Japanese and Korean approvals were obtained.

### 2.    *Analysis*

Contrary to Syngenta's contentions, I conclude that the balance of equities tips decidedly against preliminary injunctive relief. *Winter*, 555 U.S. at 20; *Roudachevski*, 648 F.3d at 705-06.   Examining and balancing the competing claims of injury, I conclude that granting the requested preliminary injunctive relief would disproportionately burden Bunge for risks that Syngenta took in marketing its Viptera corn seed for the 2011 crop year. *Id.* at 24.

First, contrary to Syngenta's contentions, Bunge's decision to reject Viptera corn at all of its locations was a legitimate and reasonable business decision, where Bunge had obtained contracts to deliver very substantial quantities of corn to China, which has not approved Viptera corn for import.   The unrebutted evidence at the preliminary injunction hearing was that Bunge does, indeed, have an integrated or interconnected export system, which makes it impracticable to segregate Viptera-free deliveries to only a few facilities that would then service the Chinese market.   Indeed, Mr. McNeely testified, without contradiction, that fifty to sixty percent of the corn received by Bunge facilities is ultimately exported; that corn not being exported is consumed at grind facilities, and some by-products are then exported; and that some corn is used domestically for poultry feed, wet milling, and other purposes; but that Bunge cannot designate corn as export or non-export when Bunge receives it.

Second, Mr. McNeely testified, again without contradiction, that to develop a separate receiving system to "identity preserve" Viptera corn separate from other commingled commodity corn, from the dump pit to the barge, would cost $6 million to $8 million *per facility* and that the costs of redirecting a shipment of corn that China refused on delivery because of Viptera tainting could be $4 million to $20 million.   As I found above, based on this evidence, it is not commercially reasonable or feasible for Bunge to

make such modifications to its facilities.  Bunge's decision to protect its Chinese corn contracts by rejecting Viptera corn is reasonable under the circumstances and seems at least as likely to ensure that no Bunge corn will be tainted with Viptera corn as the alternative of requiring Bunge to accept Viptera corn and either segregate it or segregate non-Viptera corn for export to China.  Again, the unrebutted evidence is that no testing for the Viptera trait known to Bunge would satisfy the "zero tolerance" for unapproved genetic traits imposed by China.

Third, no reasonable balance of equities would impose upon Bunge the prodigious additional expense of segregating Viptera corn (or segregating non-Viptera corn earmarked for Chinese export), where Bunge did not create the situation in which Viptera corn has not been yet approved for import in China.  That situation arises entirely because Syngenta decided to commercialize Viptera corn knowing that it did not yet have Chinese and some other import approvals and would not have them for the 2011 crop year, and under circumstances in which Syngenta should have reasonably recognized that Chinese imports of United States corn for the 2011 crop year might well be very significant.  Syngenta accepted the risk of commercializing Viptera corn, albeit with more than the required or recommended import approvals, but without import approval from all of the reasonably likely foreign markets.  I reject Syngenta's request that I shift that risk, instead, to Bunge, which made a legitimate and reasonable business decision not to accept Viptera corn in order to service the Chinese import market.  I decline to compel Bunge to forego the benefits of exporting corn to China, particularly where Bunge's decision to service the Chinese market means that Bunge must necessarily forego the financial benefit to Bunge of purchasing Viptera corn from the 12,000 growers of Viptera corn this year.

Fourth, even if I were persuaded that Syngenta had sufficient likelihood of success on its Lanham Act claim, I do not believe that the Lanham Act would support preliminary

injunctive relief as sweeping as Syngenta requests. I cannot imagine that a false advertising claim under § 1125(a)(1), premised on alleged misrepresentations of the import approval of Viptera corn and whether or not China is a "major importer" of corn, would permit preliminary injunctive relief requiring Bunge to take Viptera corn, and Syngenta has cited me no authority supporting such broad relief on such a claim. A preliminary injunction forcing Bunge to take Viptera corn would be unduly burdensome, in light of the claim at issue.

Fifth, I am not persuaded that the balance of equities is any different, in light of what Syngenta calls Bunge's "promise" to farmers that Bunge would accept Viptera corn, once Japan and Korea granted import approval for Viptera corn. *See* Defendant's Exhibit F, April 16, 2010, Notice (BNA 0001538). That promise, in April 2010, reasonably pertained to the 2010 crop year, when Viptera had not yet been released for commercial use. Indeed, the April 16, 2010, Notice expressly states that "Bunge currently **is unable to accept** delivery of the following seed product *for the 2010 growing season.*" *Id.* (underlining and bold in the original; italics added). Even if the statement that "Bunge will accept a listed product once the seed is approved in Japan and Korea" could be read to carry beyond the 2010 growing season, in the realities of the export market, such a "promise" cannot reasonably preclude a business from later deciding not to accept Viptera corn to allow the business to pursue contracts to export corn to China, which had not yet approved Viptera corn for import.

Thus, even if Syngenta has a significant likelihood of success on the merits of its claims, I would find that the balance of equities still tips against granting the requested preliminary injunctive relief. In the absence of any likelihood of success on the merits, the balance of equities plainly is against granting the requested preliminary injunctive relief.

### E.  The Public Interest

The last *Dataphase/Winter* factor requires the court to consider whether an injunction is in the public interest.  *Winter*, 555 U.S. at 20;  *Roudachevski*, 648 F.3d at 705-06.  Again, the parties dispute how this factor weighs in the analysis of Syngenta's request for a preliminary injunction.

### 1.      Arguments of the parties

Syngenta argues that Congress has enacted a strong statutory scheme to ensure that grain warehouses accept tendered grain and that goods are not disparaged in commerce.  Syngenta argues that Bunge's actions are contrary to these expressions of public interest, so that enjoining Bunge's actions would serve the public interest.

Bunge simply suggests that the public interest cannot be best served by requiring it to forego contracts to export substantial amounts of United States corn to China, where the public has an interest in expanding export markets for corn.  Moreover, Bunge asserts that the public interest is best served by placing the burden of the risks of commercialization of Viptera corn before China approved that corn for import on Syngenta, as the party that made the decision about when to commercialize Viptera corn.

### 2.      Analysis

I must consider both what public interests might be injured and what public interests might be served by granting or denying a preliminary injunction.  *See Sierra Club*, 645 F.3d at 997-98.  The Eighth Circuit Court of Appeals has also recognized that "the determination of where the public interest lies is also dependent on the determination of likelihood of success on the merits," because it is in the public interest to protect rights.  *Phelps-Roger v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008) (First Amendment rights case).  Here, Syngenta's arguments that the public interest favors injunctive relief are closely related to Syngenta's arguments that it is likely to succeed on the merits of its claims.

Unfortunately for Syngenta, I held above that Syngenta has no likelihood of success on the merits of its claims.   Thus, the public interest would be little served by granting the preliminary injunctive relief that Syngenta seeks.   On the other hand, the public interest in fostering export markets for United States corn and the public interest in allowing businesses to make legitimate business decisions would be significantly injured by granting the preliminary injunction that Syngenta seeks.   Moreover, I find that the public interest strongly favors allocating the risks of a decision to introduce a new transgenic grain into the commercial market on the company that decided to commercialize that grain before obtaining all import approvals, not on the party that is simply confronted with that decision and has reasonable countervailing business interests in not accepting the grain.

This final factor also weighs against granting the preliminary injunction that Syngenta requests.

## III.  CONCLUSION

Having considered and balanced the pertinent factors, I find that Syngenta is not entitled to the preliminary injunction that it requests.   I find no likelihood that Syngenta will succeed on the merits of the claims on which it focused, its warehousing, Lanham Act, and third-party beneficiary contract claims.   That being so, the remaining factors do not change the balance against granting preliminary injunctive relief.   While I acknowledge that Syngenta does face a substantial threat of reputational harm in the absence of a preliminary injunction, I am not convinced that the harm is of Bunge's making.   Moreover, I find that disproportionate harm would fall upon Bunge, if I were to enjoin its actions in the manner that Syngenta requests.   Bunge's decision to reject Viptera corn at all of its locations was a legitimate and reasonable business decision; the injunction would impose prodigious costs on Bunge for a situation that Bunge did not create; and Bunge's purported

promise in April 2010 to accept Viptera corn once that corn had received import approval in Korea and Japan simply does not make it inequitable for Bunge to decide for the following crop year not to accept Viptera corn, so that it could service substantial export contracts for corn to China. Finally, where Syngenta has no likelihood of success on the merits of its claims, the public interest favors denying preliminary injunctive relief, because the public interest in fostering export markets for United States corn, in allowing business to make legitimate business decisions, and in allocating the risk of commercialization of a new transgenic corn trait upon the party that commercialized the trait would thereby be best served.[11]

THEREFORE, Syngenta's August 26, 2011, Motion For Preliminary Injunction (docket no. 5) is **denied** in its entirety.

**IT IS SO ORDERED.**

**DATED** this 26th day of September, 2011.

_____
MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA

---

[11]"An order denying a preliminary injunction is immediately appealable." *Bacon v. Neer*, 631 F.3d 875, 877 (8th Cir. 2011) (citing 28 U.S.C. § 1292(a)(1)). Thus, I need not consider whether to certify this decision for immediate appeal. Nevertheless, I encourage Syngenta, as the losing party, to consider an immediate appeal, because I recognize that judges might differ on whether or not Syngenta has a private cause of action under the USWA and whether or not Bunge acted fairly and reasonably in announcing its decision to reject Viptera corn only after producers had already planted that corn.